729 A.2d 7

KATHLEEN KONZELMAN, PLAINTIFF–APPELLANT,
v. LAWRENCE KONZELMAN, DEFENDANT–
RESPONDENT.

Argued January 4, 1999—Decided May 12, 1999.

*G. Dolph Corradino,* argued the cause for appellant (*Mr. Corradino,* attorney; *Grant W. Waterson,* on the briefs).

*Edward S. Snyder,* argued the cause for respondent (*Weinstein, Penza & Snyder,* attorneys; *Mr. Snyder* and *Cynthia Borsella Lindemann,* on the brief).

The opinion of the Court was delivered by

HANDLER, J.

The issue raised in this appeal is the enforceability of a divorce judgment incorporating a property settlement agreement that authorized the termination of the husband's support and mainte- nance payments in the event of the wife's cohabitation with an unrelated male.

I

Kathleen and Lawrence Konzelman were married for twenty- seven years at the time of their divorce. Their final divorce decree, entered on October 28, 1991, incorporated a Property Settlement Agreement both parties had entered into with the benefit of counsel. Section 1(D) of that Agreement dealt with alimony. It provided that Mr. Konzelman's support and mainte- nance obligation of $700.00 per week would terminate should Mrs. Konzelman undertake cohabitation with an unrelated adult male for a period of four continuous months.

In February of 1993, Mr. Konzelman hired a private investiga- tor, Noel J. Kirkwood, to verify whether Mrs. Konzelman was living with anyone. Mr. Kirkwood undertook surveillance of Mrs. Konzelman's residence seven days a week for 127 days, mostly in the evening, nighttime, and early morning hours. Mr. Konzelman also hired L.S. Stephens, Inc., a private investigation agency, to overlap with Mr. Kirkwood in the last week of his surveillance.

The investigator reported on various activities of an "unrelated adult male" at Mrs. Konzelman's home. Specifically, Mr. Kirk- wood observed that person, Mr. Roger Liput, return to Mrs. Konzelman's residence most evenings. He left the residence most mornings to go to work. Mr. Liput used the garage door to gain

access to the garage and parked his car there. He picked up the newspaper on a regular basis and did yardwork around the residence. He answered the door to the home. He also used Mrs. Konzelman's number as a contact number for members of his softball team.

Relying on that information, Mr. Konzelman terminated alimony payments on June 26, 1993. On August 4, 1993, Mrs. Konzelman filed a Notice of Motion and accompanying certification denying cohabitation and demanding, among other things, the resumption of alimony payments and the payment of arrearage. In response, Mr. Konzelman filed a cross-motion, seeking to terminate support and maintenance. He provided certifications from four private detectives regarding Mrs. Konzelman's living arrangements; Mrs. Konzelman provided certifications rebutting those allegations. The trial court ordered Mr. Konzelman to pay support arrears and resume payment until a plenary hearing could be held.

The plenary hearing was conducted over thirteen days and included twenty-six witnesses. During the hearing, it was established that Mrs. Konzelman and Mr. Liput had a monogamous romantic relationship, which included not only spending time together at Mrs. Konzelman's home, but also vacations together abroad and at the Jersey Shore, for which Mr. Liput paid almost all the expenses. They spent holidays together with other members of their families. They had a joint savings account. Mr. Liput also performed many household chores, including mowing the lawn, gardening, and maintaining the above-ground pool, which he bought for Mrs. Konzelman. Although Mr. Liput did not have a key to the premises, he did know the code necessary to disarm the alarm system and enter the residence.

The trial court determined that Mr. Konzelman had established cohabitation. The court held, however, that the provision of the Agreement authorizing termination of alimony on cohabitation was invalid. Nevertheless, because Mr. Konzelman had established cohabitation, the court conducted a plenary hearing to determine to what extent Mr. Liput was either providing or receiving sup-

port from Mrs. Konzelman. The trial court determined that Mrs. Konzelman was receiving at least $170 per week from unidentified sources, which was attributed to Mr. Liput. Mr. Konzelman's support obligations were reduced accordingly.

Mr. Konzelman appealed, challenging the trial court's refusal to enforce the cohabitation provision of the Agreement. Mrs. Konzelman filed a cross-appeal, contesting the factual determination of cohabitation and the subsequent modification of alimony. The Appellate Division reversed. 307 *N.J.Super.* 150, 704 *A.*2d 591 (1998). It construed cohabitation as a domestic relationship whereby two unmarried adults live as husband and wife. *Id.* at 159, 704 *A.*2d 591. The court then held that "a provision of a property settlement agreement, freely entered into, which causes permanent alimony to terminate if the dependent spouse enters into a new relationship which has all the indicia of marriage except a license is enforceable." *Id.* at 161, 704 *A.*2d 591.

We granted plaintiff's petition for certification, 153 *N.J.* 405, 709 *A.*2d 798 (1998).

## II

New Jersey has long espoused a policy favoring the use of consensual agreements to resolve marital controversies. Voluntary agreements that address and reconcile conflicting interests of divorcing parties support our "strong public policy favoring stability of arrangements" in matrimonial matters. *Smith v. Smith,* 72 *N.J.* 350, 360, 371 *A.*2d 1 (1977). The prominence and weight we accord such arrangements reflect the importance attached to individual autonomy and freedom, enabling parties to order their personal lives consistently with their post-marital responsibilities. *E.g. Faherty v. Faherty,* 97 *N.J.* 99, 107, 477 *A.*2d 1257 (1984) (recognizing that divorcing parties are free to bind themselves to arbitrate disputes over alimony). Thus, it "would be shortsighted and unwise for courts to reject out of hand consensual solutions to vexatious personal matrimonial problems that have been advanced by the parties themselves." *Petersen v. Petersen,* 85 *N.J.* 638, 645, 428 *A.*2d 1301 (1981). For these reasons, "fair and definitive

arrangements arrived at by mutual consent should not be unnecessarily or lightly disturbed." *Smith, supra,* 72 *N.J.* at 358, 371 *A.*2d 1. The very consensual and voluntary character of these agreements render them optimum solutions for abating marital discord, resolving matrimonial differences, reaching accommodations between divorced couples, and assuring stability in post-divorce relationships. *Petersen, supra,* 85 *N.J.* at 645, 428 *A.*2d 1301. *See Gordon v. Gordon,* 342 *Md.* 294, 675 *A.*2d 540, 544 (1996) (stating that "separation agreements ... are generally favored by the courts as a peaceful means of terminating marital strife and discord so long as they are not against public policy").

Divorce agreements are necessarily infused with equitable considerations and are construed in light of salient legal and policy concerns. *Petersen, supra,* 85 *N.J.* at 642, 428 *A.*2d 1301. The interpretation, application, and enforceability of divorce agreements are not governed solely by contract law. "[C]ontract principles have little place in the law of domestic relations." *Lepis v. Lepis,* 83 *N.J.* 139, 148, 416 *A.*2d 45 (1980). Thus, settlement agreements, if found to be fair and just, are specifically enforceable in equity. *Schlemm v. Schlemm,* 31 *N.J.* 557, 581–82, 158 *A.*2d 508 (1960).

The adoption of a property settlement into a divorce decree does not render it immutable. Courts have continuing power to oversee divorce agreements, *Corbin v. Mathews,* 129 *N.J.Eq.* 549, 552, 19 *A.*2d 633 (E. & A.1941), and the discretion to modify them on a showing of "changed circumstances," *Berkowitz v. Berkowitz,* 55 *N.J.* 564, 569, 264 *A.*2d 49 (1970), that render their continued enforcement unfair, unjust, and inequitable. *Lepis, supra,* 83 *N.J.* at 154–55, 416 *A.*2d 45. The Court observed in *Lepis, supra:*

> When we first upheld the specific enforceability of spousal agreements in *Schlemm,* we relied on the flexible power of equity to enforce such agreements only to the extent that they were fair and equitable.
>
> [*Id.* at 148–49, 416 *A.*2d 45.]

Alimony, maintenance and support, for a dependent spouse, may clearly be the subject of a voluntary and consensual

agreement undertaken as part of the termination of marriage and divorce. *Schlemm, supra,* 31 *N.J.* at 576–82, 158 *A.2d* 508 (1960); *Sobel v. Sobel,* 99 *N.J.Eq.* 376, 379, 132 *A.* 603 (E. & A.1926). The issue of maintenance and support between divorced parties implicates important statutory and policy concerns. New Jersey requires that a dependent spouse receive alimony to assure maintenance sufficient to support that spouse based on the living standards of the couple during marriage. *N.J.S.A.* 2A:34–23; *Innes v. Innes,* 117 *N.J.* 496, 503, 569 *A.2d* 770 (1990); *Koelble v. Koelble,* 261 *N.J.Super.* 190, 192–93, 618 *A.2d* 377 (App.Div.1992). The primary purpose of alimony is to permit the spouse to share in the accumulated marital assets to which he or she contributed. *Mahoney v. Mahoney,* 91 *N.J.* 488, 500–01, 453 *A.2d* 527 (1982).

Like other spousal agreements, those covering alimony may be modified in light of changed circumstances. "The equitable authority of a court to modify support obligations in response to changed circumstances, regardless of their source, cannot be restricted." *Lepis, supra,* 83 *N.J.* at 149, 416 *A.2d* 45. Permanent alimony terminates automatically on remarriage. *N.J.S.A.* 2A:34–25. In enacting that basis or condition for discontinuing alimony, the Legislature articulated a public policy that the legal obligation of the supporting spouse is superseded and ends on the remarriage of the dependent spouse. In effect, the new marriage bond itself creates a change of circumstances that the Legislature deemed sufficiently fundamental and important to require the automatic termination of alimony. The legal obligation of postdivorce alimony is derived from the antecedent marriage; a new marriage supplants that obligation. *Gayet v. Gayet,* 92 *N.J.* 149, 151, 456 *A.2d* 102 (1983). Hence, remarriage justifies the termination of alimony without regard to the economic circumstances of the dependent spouse who has remarried.

### A.

The initial issue posed in this case is whether the dependent spouse's new relationship, characterized as one of cohabita-

tion, can itself be considered a change of circumstances.   In *Gayet, supra,* 92 *N.J.* at 154–55, 456 *A.*2d 102, the Court determined that cohabitation of the dependent spouse without more was not a changed circumstance that could justify the reduction or termination of alimony by the supporting spouse.   Cohabitation constitutes a change of circumstances only if coupled with economic consequences;  the economic benefit enuring to either cohabitor must be sufficiently material to justify relief.   *Ibid.* Under this economic needs test, the reduction in alimony is granted in proportion to the contribution of the cohabitor to the dependent spouse's needs.   *Ibid.*

The question, therefore, is whether an agreement between the parties to allow cohabitation to terminate alimony obligations can be a valid basis for discontinuing alimony, without regard to the economic consequences of that relationship.   We are satisfied that the policy considerations that allow the termination of alimony on remarriage support the termination of alimony based on cohabitation provided that both parties have agreed to this contingency.

The enforcement of a cohabitation agreement terminating alimony comports generally with the legislative and public policy of our matrimonial laws.   As noted, *N.J.S.A.* 2A:34–25 provides for the termination of permanent alimony upon remarriage, without regard to the financial condition of the dependent spouse, evincing an understanding on the part of the Legislature that the autonomous decision of the dependent former spouse to form new bonds creating mutual obligations of support must be recognized, and should, therefore, supplant the legal vestiges of the prior marriage.   The statute "signals a policy to end alimony when the supported spouse forms a new bond that eliminates the prior dependency as a matter of law." *Gayet, supra,* 92 *N.J.* at 151, 456 *A.*2d 102.   The implications of the legislative policy are clear.   The contractual termination of alimony upon cohabitation is not violative of either statutory or public policy.   The Legislature may decide to reassess this policy in light of its application here. For now, as the Appellate Division in this case explained,

> there are no considerations of public policy which should prevent competent parties to a divorce from freely agreeing that if the dependent spouse enters into a new relationship which, but for the license, is tantamount to a marriage, the economic consequences of the new relationship will be the same as those of remarriage.
>
> [307 *N.J.Super.* at 161, 704 *A.*2d 591.]

A property settlement agreement that provides for termination of alimony where the dependent spouse enters a relationship that has all the indicia of a marriage is therefore enforceable. *E.g. Quillen v. Quillen,* 265 *Ga.* 779, 462 *S.E.*2d 750 (1995) (recognizing freedom of divorcing parties to contractually alter alimony obligation based upon the occurrence of certain events); *Bergman v. Bergman,* 25 *Va.App.* 204, 487 *S.E.*2d 264, 267 (1997) (interpreting settlement agreements as any other contracts, including the enforcement of provisions terminating alimony upon cohabitation).

Where the court considers a motion for reduction of alimony based on a change of circumstances, the dependent spouse's finances and economic resources are ordinarily the court's only consideration. *E.g., Gayet, supra,* 92 *N.J.* 149, 456 *A.*2d 102. Nevertheless, a specific consensual agreement between the parties to terminate or reduce alimony based on a predetermined change of circumstances does not require an inquiry into the financial circumstances or economic status of the dependent spouse so long as the provision itself is fair. Thus, where the parties have agreed that cohabitation will constitute a material changed circumstance, and that agreement has been judged fair and equitable, the court should defer to the arrangements undertaken by the parties. In that situation where the dependent spouse has entered into a new marriage-like relationship, the court need not delve into the economic needs of the dependent former spouse.

New Jersey courts have recognized the enforceability of contractual arrangements between cohabitants to provide support. *E.g. Crowe v. DeGioia,* 90 *N.J.* 126, 447 *A.*2d 173 (1982). It appears entirely consistent with that policy to allow divorcing persons to enter into a mutual agreement that recognizes the reality and viability of cohabitation relationships. *See Gordon,*

*supra,* 675 *A.*2d at 548 (acknowledging significance of cohabitation relationships and the fairness of support agreements that take such relationships into consideration);[1] *In re Marriage of Schroeder,* 192 *Cal.App.*3d 1154, 238 *Cal.Rptr.* 12, 15 (1987) (stating that the purpose of a statute codifying cohabitation provision was "to protect the supporting spouse from an unfair advantage being gained by the supported spouse who cohabits with a person of the opposite sex").

■ We conclude that based on minimum standards to assure their mutuality, voluntariness and fairness, cohabitation agreements may be enforced.

## B.

■ Agreements to terminate alimony on the condition of cohabitation must be voluntary and consensual, based on assurances that these undertakings are fully informed, knowingly assumed, and fair and equitable. *Faherty, supra,* 97 *N.J.* 99, 477 *A.*2d 1257; *Petersen, supra,* 85 *N.J.* at 642, 428 *A.*2d 1301. We recognize that the fairness in altering an alimony obligation in the event of cohabitation by the dependent spouse must be assessed in light of all material surrounding circumstances and will vary from case to case. "[T]he weight which will be due such agreements will grow in direct proportion to the degree that these understandings have been genuinely tailored to all of the relevant matrimonial concerns of the parties." *Petersen, supra,* 85 *N.J.* at 645, 428 *A.*2d 1301; *see Lepis, supra,* 83 *N.J.* at 153–54, 416 *A.*2d 45. Thus, for example, parties can provide that alimony will terminate

---

[1] The Maryland Supreme Court explained:

[I]f the ex-spouse and the cohabitant share expenses, the ex-spouse collects support form two sources. Alternately, if the cohabitant does not pay a fair share of household expenses, then it follows that part of the support payment supports the cohabitant rather than the ex-spouse. In either situation, we believe it would be inequitable to require the spouse paying support to continue payment despite cohabiting parties' *de facto* remarriage.

[*Id.* 675 *A.*2d at 548.]

only where the dependent spouse has become contractually entitled to support from her cohabiting partner. *See Bell v. Bell*, 393 *Mass.* 20, 468 *N.E.*2d 859, 861 (1984); *accord, Crowe, supra,* 90 *N.J.* 126, 447 *A.*2d 173 (recognizing enforceability of support obligations derived from cohabitation relationship). Fairness requires that each party be adequately represented by independent counsel and that both parties completely understand the nature of the agreement. *Cf. Guglielmo v. Guglielmo*, 253 *N.J.Super.* 531, 602 *A.*2d 741 (App.Div.1992) (holding agreement to be unconscionable when the wife, who was not savvy in financial matters, was represented by the husband's relative and received support that kept her at a subsistence level while her former husband's income increased dramatically). Implicit in that standard of fairness as the basis for enforceability is the further requirement of judicial review and approval. *See D'Ascanio v. D'Ascanio*, 237 *Conn.* 481, 678 *A.*2d 469, 473 (1996) (determining that enforceability of a settlement terminating alimony in the event of cohabitation depends on whether court has approved agreement as fair and equitable); *cf. Von Pein v. Von Pein*, 268 *N.J.Super.* 7, 632 *A.*2d 830 (App.Div.1993) (finding that husband's fraudulent conduct, diversion of marital assets and conspiracy to hide assets required court to reexamine divorce settlement).

Courts in other jurisdictions that have upheld cohabitation provisions in property settlement contracts have recognized that the parties' freedom to mold contract obligations to fulfill their expectations should be assured. *See Bell, supra,* 468 *N.E.*2d at 861; *Quillen, supra,* 265 *Ga.* 779, 462 *S.E.*2d 750; *Bergman, supra,* 487 *S.E.*2d at 267; *Gertrude L.Q. v. Stephen P.Q.,* 466 *A.*2d 1213 (Del.1983); *Barr v. Barr,* 922 *S.W.*2d 419 (Mo.Ct.App.1996); *Eriksson v. Eriksson,* 128 *A.D.*2d 500, 512 *N.Y.S.*2d 429, 430 (N.Y.App.Div.1987). Some courts have emphasized that freedom of contract, when coupled with a judicial check on unequal bargaining power and the equities of the agreement, is sufficient to render such provisions enforceable. *See In the Matter of the Marriage of Laverne Watts Edwards,* 73 *Or.App.* 272, 698 *P.*2d 542 (1985); *D'Ascanio, supra,* 678 *A.*2d at 473; *Gordon, supra,*

675 A.2d at 544; *accord Taylor v. Taylor,* 11 *Ohio App.*3d 279, 465 N.E.2d 476, 477–478 (1983) (courts may not enforce cohabitation provisions without re-evaluating equities of situation).

In considering the enforceability of cohabitation agreements, concerns regarding inequality of bargaining power are genuine and, as stressed by the dissenting opinion, *post* at 204 – 05, 729 A.2d at 17, may arise not only from economic dependence but also the psychological and emotional factors in the relationship between the former spouses. *See,* Sally Burnett Sharp, *Fairness Standards and Separation Agreements: A Word of Caution on Contractual Freedom,* 132 *U. Pa. L.Rev.* 1399, 1405 (1984). For that reason, it is essential that courts inquire into the voluntariness of an agreement and its overall fairness in light of all relevant circumstances. While we are aware of the potential for unfairness and inequity, the importance of settlement agreements in the amicable resolution of the disharmonies that surround the demise of a marriage should be preserved. Such consensual agreements should be encouraged provided their provisions fully reflect the mutual wishes of the parties and their enforcement is fair and just. We affirm the ability of both spouses to make considered and lasting arrangements.

Similarly, we acknowledge that a contractual provision terminating alimony in the event of cohabitation potentially conflicts with the privacy interests of the dependent spouse. There is a danger that cohabitation provisions might encourage "economically dominant husbands to meddle arbitrarily with the post divorce lives of their wives," *Bell, supra,* 468 *N.E.*2d at 862 (Abrams, J., dissenting). The policy that ends alimony on the formation of a new legal bond is in derogation of the dependent spouse's individual privacy, autonomy and the right to develop personal relationships free from interference from either a supporting spouse or the state. *Gayet, supra,* 92 *N.J.* at 151, 456 *A.*2d 102; *accord Levine v. Bacon,* 152 *N.J.* 436, 705 *A.*2d 1204 (1998) (recognizing that parental rights of non-custodial spouse may not unduly interfere with personal freedom of custodial spouse); *Holder v. Polanski,*

111 *N.J.* 344, 544 *A.*2d 852 (1988) (same). Nevertheless, the incentive that a cohabitation agreement creates for the supporting spouse to investigate the former husband's or wife's private life is not far removed from the incentive that any potential changed circumstance may provide a supporting spouse for ascertaining the current economic status of the dependent spouse. *E.g., Gayet, supra,* 92 *N.J.* at 151, 154, 456 *A.*2d 102. We do not minimize the potential impact on the private lives of the parties, as underscored by the dissent. *Post* at 205 – 06, 729 *A.*2d at 18. While such an agreement may influence the conduct of the parties, they will have knowingly entered into such agreements, understanding what the provisions entail and, presumably, anticipating the extent to which their freedom of action may be affected.

Privacy concerns may be addressed and mitigated by judicial supervision over agreements. A cohabitation provision cannot become an instrument for vindictive, vengeful, or oppressive actions on the part of the supporting spouse nor can it be allowed to serve as punishment for post-divorce unchastity on the part of a dependent spouse; it must be predicated on the mutual wishes of the parties and reflect the economic realities that usually flow from an intimate committed relationship. Moreover, in enforcing cohabitation provisions, the court does not abrogate its equitable jurisdiction over divorce arrangements and its responsibility to assure fairness in the implementation of such arrangements. A provision for the termination of alimony based on cohabitation may, under given circumstances, be inequitable and therefore unenforceable. *Melletz v. Melletz,* 271 *N.J.Super.* 359, 368, 638 *A.*2d 898 (App.Div.) (cautioning that in situation where former husband attempted to terminate alimony on the basis of a dating relationship, "the [dependent wife] is rendered social and economic hostage of the property settlement agreement. The agreement leaves very little latitude for the [wife] to engage in even a casual or social relationship without fear of losing her

economic support ...." (quoting trial court)), *certif. denied*, 137 *N.J.* 307, 645 *A.*2d 136 (1994).

A mere romantic, casual or social relationship is not sufficient to justify the enforcement of a settlement agreement provision terminating alimony. Such an agreement must be predicated on a relationship of cohabitation that can be shown to have stability, permanency and mutual interdependence. The Appellate Division expressed that standard by defining cohabitation as a domestic relationship whereby two unmarried adults live as husband and wife. 307 *N.J.Super.* at 159, 704 *A.*2d 591. Cohabitation is not defined or measured solely or even essentially by "sex" or even by gender, as implied by the dissent. *Post* at 205, 729 *A.*2d at 18. The ordinary understanding of cohabitation is based on those factors that make the relationship close and enduring and requires more than a common residence, although that is an important factor. Cohabitation involves an intimate relationship in which the couple has undertaken duties and privileges that are commonly associated with marriage. These can include, but are not limited to, living together, intertwined finances such as joint bank accounts, sharing living expenses and household chores, and recognition of the relationship in the couple's social and family circle.

The supporting spouse must show cohabitation to the satisfaction of the court, as Mr. Konzelman did here. Although there were some inconsistencies in the private investigators' reports, both the trial court and the Appellate Division found that there was cohabitation between Mrs. Konzelman and Mr. Liput. The couple lived together most of the time. Mr. Liput paid for improvements to the residence in the form of an above ground pool, and shared in various chores around the house. They had a joint savings account and Mr. Liput paid for their vacations together. Their family holidays together further indicate that their relationship was recognized as close and sustained. There was sufficient credible evidence in the record for the trial court reasonably to find cohabitation and its finding must be granted

deference. *Rova Farms Resort, Inc. v. Investors Ins. Co.,* 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974).

We stress that to constitute cohabitation, the relationship must be shown to be serious and lasting. The Appellate Division, in declining to decide whether the four month period specified in the cohabitation agreement was sufficient to justify enforcement of the provision, noted that "Mrs. Konzelman's cohabitation with Mr. Liput has been of long duration and was still continuing at the time of trial." 307 *N.J.Super.* at 156, 704 *A.*2d 591. There was ample support for that conclusion. The reasonableness of the duration of the cohabitation that is specified in a cohabitation agreement will depend on the facts of the case. Here, Mrs. Konzelman's relationship was sufficiently stable and enduring to render the enforcement of the provision fair and equitable under the circumstances. We are not required to determine what would happen if the cohabitation came to an end, including whether other, additional obligations of support could arise from the cohabitation arrangement itself. *See Crowe, supra,* 90 *N.J.* 126, 447 *A.*2d 173. As with all divorce settlement agreements, this agreement remains subject to judicial supervision. *Petersen, supra,* 85 *N.J.* at 644, 428 *A.*2d 1301.

Finally, the cohabitation provision of the property settlement agreement was voluntary, knowing, and consensual. Both plaintiff and defendant were represented by counsel. Mrs. Konzelman alleges no improprieties, suggesting no fraud, inequity, overreaching, or coercion. She knowingly entered into an agreement fully understanding the cohabitation provision and with every opportunity to negotiate its terms. The agreement was brought to the attention of the trial court and given judicial approval when it was incorporated into the divorce decree.

### III

Because the provision terminating alimony upon cohabitation is fair under the circumstances of this case, we affirm the judgment below.

O'HERN, J., dissenting.

The private lives of divorced women are no business of the law. We have enough to do without inquiring into such matters. However, the economic needs of divorced women are the business of the law. We settled these points in *Gayet v. Gayet,* 92 *N.J.* 149, 456 *A.*2d 102 (1983).

I

Today, the Court turns back the clock on years of efforts to improve the economic and social status of divorced women. In a long series of cases, we had come to recognize that marriage is both an affair of the heart and a form of an economic partnership. *See Pascale v. Pascale,* 140 *N.J.* 583, 609, 660 *A.*2d 485 (1995) (maintenance and child support); *Portner v. Portner,* 93 *N.J.* 215, 219, 460 *A.*2d 115 (1983) (maintenance); *Lynn v. Lynn,* 91 *N.J.* 510, 516, 453 *A.*2d 539 (1982) (same); *Mahoney v. Mahoney,* 91 *N.J.* 488, 500, 453 *A.*2d 527 (1982) (same); *Rothman v. Rothman,* 65 *N.J.* 219, 229, 320 *A.*2d 496 (1974) (same). When the marriage partnership is over, we do the best that we can to recognize the economic needs of the partners. Often the woman has taken the subordinate economic role in the marital partnership, assuming child-rearing or other non-income-generating roles. Thus, as society is presently structured, the divorced woman will often have the greater economic need. That should not mean that a woman's personal life after divorce should be a matter of judicial supervision.

The Court shows sensitivity toward the rights of women, noting that anti-cohabitation agreements "reflect the importance attached to individual autonomy and freedom, enabling parties to order their personal lives consistent with their post-marital responsibilities." *Ante* at 193, 729 *A.*2d at 11 (citing *Faherty v. Faherty,* 97 *N.J.* 99, 107, 477 *A.*2d 1257 (1984) (addressing whether to enforce arbitration clause, not cohabitation clause)). The Court, however, equates personal autonomy for women with freedom of contract, thereby avoiding confrontation with the holding in *Gayet,* which

sought to protect autonomy insofar as it relates to personal relationships. Although the Court has consistently required that divorce agreements be fair and equitable, and cites cases supporting that assertion, *ante* at 194, 729 *A*.2d at 11 – 12, in those cases the Court did not depart from the economic needs standard as it has done here. *Ante* at 197, 729 *A*.2d at 13.

When viewed through the Gaussian filter employed by the Court, the anti-cohabitation clause appears as a pleasant piece of bargaining between equals. Although the Court properly declines to presume that all women are passive players in this arena, it fails to afford proper weight to the uneven economic playing field upon which the contest takes place. *Ante* at 200 – 01, 729 *A*.2d at 15. A New York study of divorce found:

> Women are at a particular economic disadvantage in divorce because they typically do not control family assets at the end of a marriage. A study that measured the economic consequences of divorce for women, by Saul Hoffman, Professor of Economics at the University of Delaware and Greg J. Duncan, University of Michigan, found that standard of living drops 30 percent for women and rises 10–15 percent for men in the one year following divorce.
>
> [*Women in Divorce: Lawyers, Ethics, Fees & Fairness: A Study by the City of New York Department of Consumer Affairs* at 8–9 (Mar.1992).]

The majority downplays the woman's loss of freedom or autonomy by asserting that the case is not about sex, but that it is about money, the freedom of contract, and whether the anti-cohabitation provision entered into was "voluntary, knowing and consensual," *ante* at 203, 729 *A*.2d at 17 and based upon "mutuality, voluntariness and fairness." *Ante* at 198, 729 *A*.2d at 14. It offends our intelligence for ·defendant to suggest that the anti-cohabitation clause in this case is not about sex. If the clause were not about sex, why then is cohabitation with another person of the same sex permitted without a reduction in support?

For reasons rooted in our past, "social conventions [still seek to] ... deny women the same chance of sexual happiness as men...." Alan Ryan, *Cultural Perversions,* N.Y. Times Book

Review at 16 (Mar. 14, 1999) (reviewing Martha C. Nussbaum, *Sex and Social Justice* (1999)). There is a double standard at play here that views women as having a lesser need than men for companionship of the opposite sex, "yet ... universally punishe[s] [women] if they display evidence to the contrary...." Natalie Angier, *Men, Women, Sex and Darwin,* N.Y. Times Magazine, Feb. 21, 1999, at 51.

The danger against which courts have guarded in the past concerns "the numerous ways in which a spouse can use [economic power associated with spousal support] to exert unjust and inappropriate control over the recipient's personal life." Sara Z. Moghadam, *The Maryland Survey: 1995–96: C. Dismissing the Purpose and Public Policy Surrounding Spousal Support,* 56 *Md. L.Rev.* 927, 927 (1997). "Modern constitutional development of privacy rights [views] a decision of continued alimony based on the sexual habits of either a man or woman highly suspect." Evan J. Langbein, *Post–Dissolution Cohabitation of Alimony Recipients: A Legal Fact of Life,* 12 *Nova L.Rev.* 787, 788 (1988). "Whether one defines [the right to privacy or personal development] as a 'right to intimacy and a freedom to do intimate things,' or 'a right to the integrity of one's personality,'" *see* Henkin, "Privacy and Autonomy," 74 *Colum. L. Rev.* 1410, 1419 (1974), the essence of the matter is that "governmental regulation of private personal behavior ... is sharply limited." *State v. Saunders,* 75 *N.J.* 200, 213, 381 *A.*2d 333 (1977) (internal quotations omitted).

The Court repeats the reasoning of the Appellate Division that "there are no considerations of public policy which should prevent competent parties to a divorce from freely agreeing [to an anticohabitation clause]...." *Ante* at 197, 729 *A.*2d at 13 (quoting 307 *N.J.Super.* at 161, 704 *A.*2d 591). In other words, a deal is a deal. Not so long ago in the *Baby M.* decision, Chief Justice Wilentz dispatched such reasoning in a single sentence. He wrote: "There are, in a civilized society, some things that money cannot buy." *In re Baby M.,* 109 *N.J.* 396, 440, 537 *A.*2d 1227 (1988). In a civilized society, money cannot buy a woman's right

to choose her companions. A husband should not be able to demand an exchange of that freedom as a bargaining tool.

## II

In *Gayet, supra,* 92 *N.J.* at 153, 456 *A.*2d 102, the Court adopted an economic needs test to determine whether cohabitation requires modification of an alimony award. The economic needs test has been followed by a majority of jurisdictions. Sally Burnett Sharp, *Step by Step: The Development of the Distributive Consequences of Divorce in North Carolina,* 76 *N.C. L.Rev.* 2017, 2100–01 (Sept.1998). We considered central that "[t]he extent of actual economic dependency, not one's conduct as a cohabitant, must determine the duration of support as well as its amount." *Gayet, supra,* 92 *N.J.* at 154, 456 *A.*2d 102. We conceded that "this approach to cohabitation may discourage marriage, at a time when human relationships have grown more and more transient." *Id.* at 155, 456 *A.*2d 102 (citations omitted). Nonetheless, we emphasized that the test for support should be based upon economic circumstances because that standard "best balances the interests of personal freedom and economic support...." *Id.* at 154, 456 *A.*2d 102. *Gayet, supra,* was consistent with prior law and long-standing principles. *See, e.g., Lepis v. Lepis,* 83 *N.J.* 139, 151–52, 416 *A.*2d 45 (1980) (concluding that "changed circumstances" measured by economic needs of supported spouse remains standard in New Jersey and that "changed circumstances" warrant only modification, not elimination, of alimony). Subsequent decisions have reaffirmed that philosophy. *See Melletz v. Melletz,* 271 *N.J.Super.* 359, 368, 638 *A.*2d 898 (App.Div.) (concluding that "[c]ohabitation clauses beyond the economic contribution standards of *Gayet* or other recognized matters of mutual concern fall short of this standard and will not be enforced", *certif. denied,* 137 *N.J.* 307, 645 *A.*2d 136 (1994)); *Pugh v. Pugh,* 216 *N.J.Super.* 421, 422, 524 *A.*2d 410 (App.Div.1987) (declining to enforce cohabitation provision in separation agreement that disregards economic needs

standard because such agreement "conflicts with our stated public policy to guarantee individual privacy, autonomy, and the right to develop personal relationships."); *Hurley v. Hurley*, 230 *N.J.Super.* 493, 495, 553 *A.2d* 891 (Ch.Div.1988) (concluding that "changed circumstances" measured by economic needs of supported spouse remains applicable standard).

By abandoning the economic needs test of *Gayet, ante* at 197, 729 *A.2d* at 13, the Court has equated cohabitation with marriage. We have never equated cohabitation with marriage. *Cf. Crowe v. De Gioia,* 90 *N.J.* 126, 132, 447 *A.2d* 173 (1982) (refusing to recognize non-marital relationships as lawful marriages but allowing temporary support agreements between unmarried cohabitants based on equitable grounds though no statutory basis exists), *appeal after remand,* 203 *N.J.Super.* 22, 495 *A.2d* 889, *aff'd* (1985), 102 *N.J.* 50, 505 *A.2d* 591 (1986).

Mrs. Konzelman is punished for her choice of companionship while Mr. Konzelman is relieved of the burden to demonstrate that his former partner's financial status is any better because of her new relationship. That approach ignores the economic needs and dependency test that underpins an alimony obligation. The trial court found that Mrs. Konzelman's financial status had improved only to the extent of $170 per week because of her relationship.

Mrs. Konzelman was married for twenty-seven years. The record does not disclose whether she left work to raise her children, thereby decreasing her potential for earnings. That is often the case.

> Although wives today may be less economically dependent on their husbands than was the case in the past, it remains true that the typical alimony recipient is a woman who has sacrificed her earning capacity to her marriage and who, as an equitable and practical matter, must look to her former husband for financial support following a separation or divorce. Such women have little bargaining power and to a large extent must rely on judicial supervision to ensure that their entitlement to support is not made contingent on unjust or unreasonable conditions.
>
> [*Bell v. Bell,* 393 *Mass.* 20, 468 *N.E.*2d 859, 863 (1984) (Abrams, J., dissenting) (citing *Knox v. Remick,* 371 *Mass.* 433, 358 *N.E.*2d 432 (1976), *cert. denied,* 470 *U.S.* 1027, 105 *S.Ct.* 1392, 84 *L.Ed.*2d 782 (1985)).]

*See also Guglielmo v. Guglielmo,* 253 *N.J.Super.* 531, 543, 602 *A.*2d 741 (App.Div.1992) (holding to same effect).

Dependency acquired during the marriage based on the marital roles assumed by the parties is at the heart of an alimony obligation. It is manifestly unfair to relieve Mr. Konzelman of all alimony obligations based upon Mrs. Konzelman's choice of companionship with another man, when economic need is the true measure of alimony. The law is casting this partner of twenty-seven years into poverty for what, a sin? If her relationship ends, she will not even have, from the partners' once-shared earning capacity, a dollar a week to live on while Mr. Konzelman will be permitted to reap the benefits of an increased earning capacity built up during the marriage.

Some states have enacted anti-cohabitation statutes that terminate alimony if the dependent party cohabits with a member of the opposite sex. Burnett Sharp, *supra,* 76 *N.C. L.Rev.* at 2099. New Jersey has not done so. Nor is it likely to do so. These laws are "Hydra-like statute[s] that [are] misguided, ambiguous, overinclusive, punitive, possibly void for vagueness, and ... [have] effectively thrown out the baby—proof of changed economic circumstances—with the bathwater. The change of circumstances standard, focusing on the economic contributions ... is a considerably more sensible and easy to follow standard." *Id.* at 2106.

Although the majority bases its decision upon the first *Gayet* policy consideration that upon remarriage, "a new bond ... eliminates the prior dependency as a matter of law," *Gayet, supra,* 92 *N.J.* at 151, 456 *A.*2d 102, the Court disregards *Gayet*'s latter consideration of an individual's personal affairs and the right to be free from governmental interference. *Ante* at 197, 729 *A.*2d at 13. The two policies are inextricably intertwined.

In *Melletz, supra,* Judge Dreier punctured the hypocrisy attendant to anti-cohabitation clauses by asking the rhetorical question: could a divorced wife obtain a similar promise from her husband in return for less alimony? 271 *N.J.Super.* at 365–66, 638

A.2d 898.  That court concluded that the agreement could not be
upheld because it represented an attempt to control the former
spouse's conduct and to "attach conditions to [the] receipt of ...
alimony which are unrelated to her financial status [and] would
contravene the very purpose of alimony."  *Id.* at 367, 638 A.2d 898
(citation omitted).

### III

Finally, the enforcement of anti-cohabitation clauses imposes a
needless burden on the judiciary and the matrimonial bar.  This
trial consumed thirteen days over three months and included
twenty-six witnesses.  The evidence included the reports and
testimony of several private investigators, one of whom watched
Mrs. Konzelman's home seven days a week for 127 days.  It would
not have taken thirteen days or a spy in her yard to determine
that Mrs. Konzelman's companion contributed $170 a week to the
household.  As a result of the Court's ruling, each *Konzelman*
hearing hereinafter will result in an exhaustive (and exhausting)
inquiry into whether the situation involved something more than
"a mere, romantic, casual or social relationship.... "  *Ante* at 202,
729 A.2d at 16.  (Does this mean that there is a platonic defense to
anti-cohabitation clauses?)  Such tasteless inquiries into the pri-
vate lives of divorced women, when unnecessary, are beneath the
dignity of the judiciary.

In addition, by approving anti-cohabitation clauses, the Court
will force attorneys and parties to bargain over the fair value of
the clause.  The Court's holding invites husbands to seek such
clauses, perhaps as a bargaining chip.  There are only two pur-
poses for the clause, either to eliminate the need to examine
changed economic circumstances or to retain control over the
divorced spouse.  Either way, there will be a price.  Wives will
not wish lightly to contemplate the kind of surveillance this woman
endured.  It is the regrettable the way of the world that only the
wealthy will want to or will be able to buy the clause.  I would not

add to the already emotionally charged denouement of a marriage this unseemly bit of bargaining.

## IV

The respected Justice Ruth Abrams of the Supreme Judicial Court of Massachusetts has said it best:

> By giving its imprimatur to an interpretation of the [anti-cohabitation clause] that hinges the plaintiff's entitlement to support on her conformity to life-style requirements imposed by the defendant, the court encourages economically-dominant husbands to meddle arbitrarily with the postdivorce lives of their wives....
>
> [*Bell, supra,* 468 *N.E.*2d at 863 (Abrams, J., dissenting).]

I agree. I would reverse the judgment of the Appellate Division and reinstate that of the trial court reducing Mrs. Konzelman's alimony by $170 per week.

STEIN, J., joins this opinion.

*For affirmance*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, GARIBALDI and COLEMAN—5.

*For reversal*—Justices O'HERN and STEIN—2.