**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3649-14T3

FRANCES CASO,

    Plaintiff-Appellant,

v.

FERNANDO GUERRERO,

    Defendant-Respondent.

_____

> Argued on November 30, 2016 — Decided September 13, 2017
>
> Before Judges Fuentes, Simonelli and Gooden Brown.
>
> On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FM-02-2622-11.
>
> Mark P. Fierro argued the cause for appellant.
>
> Gerald R. Salerno argued the cause for respondent (Aronsohn Weiner Salerno & Kaufman, PC, attorneys; Mr. Salerno and Keri L. Greene, on the brief).

PER CURIAM

    Plaintiff Frances Caso appeals from the March 2, 2015 order of the Family Part, granting defendant Fernando Guerrero's motion to terminate his alimony obligation based on plaintiff's

cohabitation, and ordering plaintiff to repay $111,600, representing the overpayment of alimony from March 25, 2013 to February 28, 2015. We affirm.

We glean the following facts from the record. The parties married on December 23, 2003 and divorced on September 27, 2011. No children were born of the marriage. The Dual Final Judgment of Divorce (DJOD) incorporated the terms of a Property Settlement and Support Agreement (PSSA), which the parties voluntarily negotiated and entered into with the assistance of independent counsel. Article III of the PSSA addresses alimony. Subsection 3.1 delineates defendant's obligation to pay plaintiff limited duration alimony for a period of six years at a rate of $7200 per month, commencing on October 1, 2011. Under Subsection 3.2, alimony "shall terminate before the six (6) year term upon the death of [defendant] or the death of [plaintiff], the remarriage of [plaintiff], whichever event first (1st) occurs." Subsection 3.2 provides further that:

> in the event that [plaintiff] cohabits with an unrelated adult male in a relationship tantamount to marriage, and pursuant and subject to the then current New Jersey case law, [defendant] shall have the right to make an application to the [c]ourt for modification and/or termination of the alimony based upon the then-existing facts and then-existing case law.

Any modification of the alimony obligation was restricted under the PSSA as follows:

> 3.4 Neither [p]arty shall seek to obtain from the other, either formally or informally, through court application, nor otherwise, any modification of the per annum spousal support payments set forth in paragraph 3.1 of this Agreement. By virtue of their execution of and entry into this Agreement, the Parties hereby waive their respective rights under Lepis v. Lepis, 83 [N.J.] 139 (1980). Any change in the needs, expenses, incomes and employment or circumstances of the [p]arties, including age, employment status and the like, shall not constitute a basis or criterion to be used, directly or indirectly, as an application for a modification, increase or extension of alimony, at any time, by either party, to any court of competent jurisdiction.

> 3.5 The parties specifically agree that the following events shall _not_ be considered to constitute a "change in circumstances" which would justify either party seeking to modify the provisions of this Agreement as it relates to alimony:

> 1. Either party obtaining new employment; and/or

> 2. Any increase or decrease in the net salary of either party; and/or

> 3. Either party obtaining additional income from any other source; and/or

> 4. Any increase in the cost of living or living expenses as experienced by either party; and/or

> 5. Either party becoming unemployed; and/or

3

6. Either party failing to obtain employment; and/or

7. Any increase or decrease in the gross or net salary or income of either party above or below his or her present level of earnings or income; and/or

8. Any illness, disability or infirmity arising hereinafter; and/or

9. Any other reason whether foreseeable or not.

On March 25, 2013, defendant filed a post-judgment motion seeking to modify or terminate his alimony obligation retroactive to October 1, 2011, claiming plaintiff was cohabitating with her paramour, Jose Perez, who was the father of plaintiff's child born approximately four months after the entry of the DJOD. After determining that defendant met the prima facie burden of demonstrating plaintiff's cohabitation, the trial court conducted a plenary hearing during which the burden of proof shifted to plaintiff to demonstrate the absence of economic benefit or financial interdependence between herself and Perez. Plaintiff, Perez, defendant and defendant's private investigator, Stephen Bojekian, testified at the six-day plenary hearing.

Plaintiff claimed that she and Perez shared a casual, noncommittal sexual relationship that produced a child in January 2012, whom they co-parent. Plaintiff admitted proposing to Perez having a "designer" baby with him. Plaintiff claimed, however,

A-3649-14T3

that she and Perez never shared a residence, were not financially interdependent, and the time spent together at each other's homes was solely for the purpose of co-parenting. In contrast, defendant asserted that the relationship between plaintiff and Perez was intertwined beyond conception and co-parenting their daughter. Defendant alleged that the relationship possessed elements of cohabitation, including subsidizing each other's finances, shared living arrangements and household duties, recognition of their relationship in family circles and on social media and participation in the lives of each other's families.

During the hearing, the evidence showed that, despite Perez' marriage to someone else on September 20, 2013, and having a child from that union, plaintiff and Perez spent up to five nights per week together at each other's home, both prior to and subsequent to Perez' marriage. They also traveled together, both with and without their daughter, vacationed together, shared responsibility for household chores and held themselves out as a married couple, particularly on social media. Additionally, plaintiff hosted Perez' family at her home, including his mother who traveled from the Dominican Republic, Perez' home country, when plaintiff gave birth to their daughter, and again in December 2013 to celebrate a traditional Dominican Christmas as a family. Perez' sisters and

brothers also visited plaintiff's home frequently, with two of his sisters staying overnight.

The trial judge described Perez as follows:

> Perez who fashions himself as a ladies' man, spent 18 1/2 years in federal prison for cocaine distribution, was released in or about 2008 and since released has not held a steady job; yet Perez speaks as a self-proclaimed jet-setter with a high profile New York club nightlife, frequent dinners out, designer clothing, and high-end automobiles. Most interestingly, Perez, after the [d]efendant's post-judgment motion was filed, married . . . but made clear during testimony that fidelity forms no part of his marital vows.
>
> . . . .
>
> Perez was very evasive in answering questions presented to him, particularly regarding the frequency with which he stayed or continues to stay overnight in [plaintiff's] Englewood Cliffs home. It became patently clear to the [c]ourt that it was in Perez' self-interest to maintain that he did not stay overnight in [plaintiff's] home, as overnights outside of New York, without the permission of his federal probation officer would be a violation of his probation.[1] Despite Perez claiming that he received permission from his probation officer for every overnight he spent in [plaintiff's home], the [c]ourt finds suspect that Perez could have presented unbiased third-party proofs from his probation officer to lend credibility to his testimony, but failed to do so.

---

[1] We believe the judge intended to refer to Perez being on parole under the supervision of a parole officer.

> Perez described the inception of his relationship with the [p]laintiff as a "goof." He thought [p]laintiff's idea of a designer baby was a joke, a game to [p]laintiff. He claims to be "not the type of person to be in one place" and that he "collects women as a hobby."

Evidence of plaintiff and Perez' cohabitation was further corroborated by Bojekian's investigation. Bojekian conducted database searches that showed plaintiff's address as an address associated with Perez. Bojekian's investigation of a Connecticut and a New York address also associated with Perez revealed that Perez was not residing at either address. Bojekian also installed a pole camera to conduct video surveillance of plaintiff's home over a fourteen-day period, beginning July 29, 2014. The surveillance footage revealed Perez at the home during eight of the fourteen days, where he engaged in activities such as taking out the garbage, picking up the newspaper, conversing with a neighbor, carrying packages into the home, emptying the trunk of plaintiff's car, operating plaintiff's BMW and the Ducati motorcycle plaintiff purchased for him, and washing her BMW and Mercedes in the driveway. These activities occurred long after Perez' September 20, 2013 marriage.

Neither plaintiff nor Perez disputed sharing household chores in plaintiff's home. Both testified that plaintiff did the cooking, laundry and light cleaning, while Perez retrieved mail,

took out the garbage, washed the cars, assisted with heavy duty cleaning, painted the entire house, repaired the sprinkler system and maintained the home security system. In family circles and social media, plaintiff and Perez referred to each other as husband and wife. Plaintiff explained that "holding ourselves out . . . in public like we really are married" was basically for the benefit of their daughter. She also testified that "in that Spanish community," those terms were "used very . . . loosely." Plaintiff and Perez also purchased matching wedding rings from a pawnshop, which they characterized in their testimony as "friendship rings." In their postings on Facebook, Instagram and Twitter, plaintiff referred to Perez as her "hubby," "boo-boo," "love," "world[,]" "partner[,]" "life[,]" and Perez referred to plaintiff as his "wife," "wifey[,]" "love," "partner," and "life." Perez also referred to plaintiff's residence as his "home."

In a series of photographs posted by Perez depicting the interior of plaintiff's garage with her expensive automobiles, Perez wrote "[m]y garage is looking good" and "nice day gone [cruising] in my [Mercedes] 500SL." When confronted with the postings, Perez explained that he purposely made false representations to deceive people. In recounting Perez' testimony in that regard, the judge observed:

> [H]e is gratified about what he testifies is his purposeful deceit of people. He testified that the majority of his Facebook, Instagram and Twitter posts were not legally or factually accurate, but rather are oftentimes specifically posted to either deceive or aggravate others. His testimony speaks volumes about his untrustworthiness.

Evidence also showed that plaintiff essentially supported Perez and members of his family, and her spending and unexplained bank deposits far exceeded defendant's alimony obligation, which she claimed was her only source of income. Documentary evidence in the form of cancelled checks showed that plaintiff paid significant sums of money either directly to Perez or to third parties on his behalf. Over an eighteen-month period, from February 6, 2011 to September 27, 2012, these cancelled checks totaled over $23,000, in addition to plaintiff purchasing expensive gifts for Perez, such as the $18,000 Ducati motorcycle. Plaintiff claimed that she was essentially paying Perez for work he performed on her home.

Although plaintiff had not worked in thirteen years, her Case Information Statement (CIS) showed expenses totaling $12,265 per month, or $147,180 per year, which exceeded defendant's alimony payments by $60,780 per year. Plaintiff explained that her mother paid the mortgage and property taxes on her home and would sometimes help her out financially. However, from 2011 through

the middle of 2013, plaintiff's bank statements showed average monthly deposits of $21,000, a sum far exceeding her monthly needs as reflected on her CIS and monthly alimony payments from defendant. Plaintiff attributed her excess deposits to funds received from a pre-marital Franklin-Templeton bond account worth approximately $90,000, and her receipt of equitable distribution from an IRA Rollover totaling approximately $180,000. However, even accounting for these additional sources, plaintiff was still depositing unaccounted for funds at an average of $21,000 per month.

The judge described plaintiff's finances thusly:

> The testimony of [p]laintiff and Perez as it relates to their finances can best be described as farcical. . . .
>
> Perez asserts that he owns a hotel in the Dominican Republic and a home in Connecticut, but does not live there, only uses the address for the purpose of insuring his automobile at reduced rates. He testifies to providing very limited monies to [p]laintiff for their mutual child. In fact, his contribution seems to have been purchasing pampers or milk, on occasion.
>
> . . . .
>
> Listening to [p]laintiff's testimony makes clear that she receives little to no financial support from Perez, but instead serves as the primary, if not only, means of financial support for Perez and the daughter they share in common.

10

In addition to funding his living expenses in [plaintiff's home], [p]laintiff, on occasion, has paid her paramour's rent, his dental expenses, his automobile insurance, and his gym membership. She purchased an $18,000 Ducati motorcycle for him, which she registered in his name. She has further lavished him with a $2,500.00 Gucci watch, a $600.00 fur coat, Botox injections, and has allowed him to use her luxury vehicles.

Plaintiff allows Perez to provide no meaningful monetary support to their mutual child. She welcomes, Perez, his "wife" and their new child into her home and provides for them as well. Eerily, Perez has some Svengali effect upon plaintiff. It is almost as if they live in a commune with no one but [p]laintiff contributing to the financial well-being of the clan.

. . . .

Plaintiff also testified that she is incapable of working due to back injuries she sustained in an automobile accident in 2013, which aggravated a prior disc herniation. Despite [p]laintiff's claim of inability to work, not a scintilla of medical evidence was presented to the [c]ourt to support that claim. Further, [p]laintiff had no trouble in traversing the courtroom in 3 1/2" stiletto heels.

Nonetheless, plaintiff portrayed her economic situation as dire. She testified that at different times, her utilities and cable service were shut off, her credit card payments on her thirteen cards were overdue, her car insurance lapsed and her BMW was repossessed. Defendant acknowledged during his testimony that plaintiff "had a terrible drug problem" and he had worked hard

11

while they were together to get her off drugs. According to defendant, after the parties separated, he would visit plaintiff every two weeks to drop off her check and remove his personal belongings from the residence. During one of his visits, defendant observed drug paraphernalia and an unfamiliar phone containing text messages for drug deals.

Following the hearing, in a written opinion, Judge Bonnie J. Mizdol granted defendant's motion and terminated his alimony obligation as of the March 25, 2013 filing date. Relying on Konzelman v. Konzelman, 158 N.J. 185 (1999), Judge Mizdol determined that the provision of the PSSA allowing for the modification or termination of alimony was an enforceable contract as "there [was] no dispute that the parties entered into their PSSA knowingly and voluntarily after it had been negotiated with the help of independent counsel" and "[i]ts fairness and equity [was] not challenged." Judge Mizdol interpreted the PSSA "to mean that [she] should apply the facts, statutory law, and case law in existence at the time the [c]ourt is called upon to make the cohabitation determination."

The judge found further "that the anti-Lepis provisions contained in Article 3.4 of the PSSA [were] wholly inapplicable to an allegation of cohabitation." She noted "[t]o find otherwise would require the [c]ourt to find that the cohabitation language

12

of Article 3.2 was entirely superfluous to the PSSA and despite any cohabitation" by plaintiff, "[d]efendant would not be entitled to seek termination or modification of his alimony obligation[,]" an interpretation Judge Mizdol characterized as "nonsensical." After finding the anti-Lepis provision inapplicable, Judge Mizdol noted that modification or termination of alimony is justified "whenever changed circumstances substantially modify the economic conditions of the parties."  Further, "'the dependent spouse's cohabitation with another'" was "[s]pecifically included in the changed circumstances to be considered" by the court.

Recognizing that her task was "to determine whether circumstances have rendered all or a portion of the support received unnecessary[,]" Judge Mizdol applied the principles of Garlinger v. Garlinger, 137 N.J. Super. 56 (App. Div. 1975) and Gayet v. Gayet, 92 N.J. 149 (1983), as well as the amended alimony statute, N.J.S.A. 2A:34-23, to conclude that "the evidence presented at the hearing proved overwhelmingly that [p]laintiff was cohabiting with Perez."  The judge determined further that plaintiff failed "to prove lack of intertwinement and continued need."  Rather, the "proofs unequivocally demonstrate[d] that [p]laintiff has been funding her paramour's lifestyle."

In making factual findings, Judge Mizdol found "the candor of [p]laintiff and Perez waned" and even questioned "the veracity

13                                          A-3649-14T3

of the marriage of Perez shortly after the motion to terminate alimony was filed." Notably, the judge observed "[p]laintiff 'creaming' her arms with body lotion during witness examination, almost as if the proceedings were akin to casual entertainment, rather than a trial proceeding." Although Judge Mizdol was "unable to solve the mystery of the source of the sizeable deposits made to [p]laintiff's bank account on a monthly basis," she determined that "[p]laintiff's access to the funds cannot be denied."

In considering defendant's financial ability, Judge Mizdol explained:

> The [c]ourt is mindful that [d]efendant's Case Information Statement[] . . . demonstrates that he has the financial ability to sustain alimony payments to [p]laintiff. However, his ability is not the test, but merely one of the factors the [c]ourt needs to consider. That he has a contractual obligation to [p]laintiff is without question. That his contractual obligation is to [p]laintiff and [p]laintiff alone is also without question.

The judge concluded:

> The evidence presented establishes that [d]efendant is funding not only [p]laintiff's large lifestyle, but the large lifestyle of [p]laintiff's paramour, their mutual child, and her paramour's extended family in some communal like clan fashion; financial obligations that are in no way [d]efendant's obligations. Defendant is not required to contribute toward the support of his former spouse's paramour or the members of whatever

14

> contemporary lifestyle [p]laintiff chooses to
> fund.  Such a finding would be unconscionable.

Judge Mizdol entered judgment for $111,600 in favor of defendant,[2] and awarded defendant counsel fees totaling $14,470.50.  This appeal followed.

On appeal, plaintiff argues the judge erred in finding cohabitation.  Plaintiff asserts that "[i]f anything, the alimony obligation should have been modified during the time period in which the [t]rial [c]ourt believed [plaintiff] was cohabiting with [Perez]" and "reinstated . . . in full" once the court believed the cohabiting ceased.  Further, plaintiff argues the judge improperly relied on plaintiff's "access to additional funds" to determine "that she failed to prove her continued need for support" because the PSSA expressly exempted "additional income" from any source by either party as constituting changed circumstances warranting a modification.

After carefully reviewing the record, we affirm substantially for the reasons expressed by Judge Mizdol in her comprehensive and well-reasoned written opinion of March 2, 2015.  Judge Mizdol's

---

[2] The judgment amount was calculated based on defendant making monthly payments of $7,200 from April to December 2013, and monthly payments of $3,600 from January 2014 to February 2015, when the court granted defendant's application to reduce his alimony payment pendente lite to avoid overpaying while awaiting the hearing.

A-3649-14T3

factual findings are well-supported by "substantial, credible evidence" in the record, particularly given the credibility issues involved, our limited scope of review, and the deference we accord "to family court [fact-finding]." Cesare v. Cesare, 154 N.J. 394, 411-13 (1998). We are also satisfied that Judge Mizdol's legal conclusions, which are subject to our plenary review, are sound. Crespo v. Crespo, 395 N.J. Super. 190, 194 (App. Div. 2007). We add only the following comments.

New Jersey embraces the resolution of marital controversies through property settlement agreements (PSA), which are voluntarily entered into and promote post-divorce stability. Konzelman, supra, 158 N.J. at 193-94. PSAs are enforceable in equity and governed by basic contract principles. Id. at 194. "Among those principles are that courts should discern and implement the intentions of the parties. Thus, when the intent of the parties is plain and the language is clear and unambiguous, a court must enforce the agreement as written, unless doing so would lead to an absurd result." Quinn v. Quinn, 225 N.J. 34, 45 (2016).

Provided both parties have knowingly and voluntarily agreed to the contingency, a provision in a PSA that terminates an alimony obligation upon a finding of a dependent spouse's cohabitation is valid and enforceable, regardless of the economic consequences.

16

Konzelman, supra, 158 N.J. at 196-97. "It is irrelevant that the cohabitation ceased during trial when that relationship had existed for a considerable period of time. Under those circumstances, when a judge finds that the spouse receiving alimony has cohabited, the obligor spouse is entitled to full enforcement of the parties' agreement." Quinn, supra, 225 N.J. at 55.

Cohabitation involves an "intimate," "close and enduring" relationship, requiring "more than a common residence" or mere sexual liaison. Konzelman, supra, 158 N.J. at 202. Cohabitation involves conduct whereby "the couple has undertaken duties and privileges that are commonly associated with marriage." Ibid. Indicia of cohabitation may also "include, but are not limited to, living together, intertwined finances such as joint bank accounts, sharing living expenses and household chores, and recognition of the relationship in the couple's social and family circle." Ibid. The 2014 amendment to the alimony statute, that sets forth considerations that bear upon cohabitation issues, authorizes suspension or termination of alimony once cohabitation is established. N.J.S.A. 2A:34-23(n).

Changed circumstances resulting from a dependent spouse's cohabitation warrant modification "when (1) the third party contributes to the dependent spouse's support, or (2) the third party resides in the dependent spouse's home without contributing

anything toward the household expenses." Gayet, supra, 92 N.J. at 153. Simply stated, modification is required "only if one cohabitant supports or subsidizes the other under circumstances sufficient to entitle the supporting spouse to relief." Id. at 153-54. "[A] rebuttable presumption of changed circumstances [arises] upon a prima facie showing of cohabitation. The burden of proof, which is ordinarily on the party seeking modification, shifts to the dependent spouse" to "show that there is no actual economic benefit to the spouse or the cohabitant." Ozolins v. Ozolins, 308 N.J. Super. 243, 245, 248-49 (App. Div. 1998). To rebut the presumption, a dependent spouse must prove he or she remains dependent on the former spouse's support. Gayet, supra, 92 N.J. at 154-55. Here, Judge Mizdol correctly determined that plaintiff failed to meet her burden of proof.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION