**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2594-17T3

L.R.,

     Plaintiff-Appellant,

v.

R.R.,

     Defendant-Respondent.

_____

        Argued December 11, 2018 – Decided February 5, 2019

        Before Judges Suter and Geiger.

        On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Burlington County, Docket No. FM-03-1196-11.

        Michael J. Confusione argued the cause for appellant (Hegge & Confusione, LLC, attorneys; Michael J. Confusione, of counsel and on the brief).

        David R. Cardamone argued the cause for respondent (Miller & Gaudio, PC, attorneys; David R. Cardamone, on the brief).

PER CURIAM

Plaintiff L.R. (Lisa)[1] appeals from a December 29, 2017 post-judgment Family Part order terminating alimony effective June 24, 2015, awarding defendant R.R. (Richard) attorney's fees in the amount of $8800, and denying all other requests for relief. We affirm.

The parties were married in March 1992 and divorced in 2013. The dual final judgment of divorce (FJOD) incorporated the terms of the marital settlement agreement (MSA) entered into by the parties. Two children were born of the marriage, R.R. (Ricky), born in 1993, and R.R. (Rebecca), born in 1994. At the time of the divorce, Ricky was emancipated but Rebecca was not. Richard was fifty-five years old.

The MSA required Richard to pay permanent alimony to Lisa in the amount of $3499.16 semi-monthly for six months, and thereafter, $2383.33 semi-monthly. Relevant to this appeal, the MSA included the following additional alimony terms and conditions. Richard's alimony obligation shall terminate upon the death of either party or Lisa's remarriage. With regard to applications to modify alimony and cohabitation, the MSA provided:

> viii. Applications to review alimony shall be governed by [Lepis v. Lepis, 83 N.J. 139 (1980)] and/or

---

[1] Pursuant to Rule 1:38-3(d) and to protect their privacy interests and avoid confusion, we refer to the parties and their children by their initials or first names. We mean no disrespect by this informality.

A-2594-17T3

applicable statutory or caselaw concerning changed circumstances. However, it is specifically understood and agreed as follows:

> a. Wife's cohabitation with a family member shall not constitute a change of circumstance. Wife's adult daughter from a previous relationship currently resides with Wife. The vacation of the Wife's household by this daughter shall not be considered a change of circumstances warranting a review of support.

> b. Wife's cohabitation with a person unrelated by blood or marriage as defined by [Garlinger v. Garlinger, 137 N.J. Super. 56 (App. Div. 1975)] and [Gayet v. Gayet, 92 N.J. 149 (1983)] for a period of six months shall be considered a change of circumstances warranting a review of support pursuant to Lepis.

Both children were emancipated when the post-judgment motion practice at issue began.[2] A plenary hearing was conducted in 2017 on the issue of reducing or terminating Richard's alimony obligation. That plenary hearing was the culmination of two years of motion practice by both parties that started with Lisa moving to increase alimony and unemancipate their two children and Richard cross-moving to reduce or terminate alimony due to Lisa's alleged

---

[2] By this point, Ricky was twenty-two years old and Rebecca was less than three months from her twenty-first birthday.

A-2594-17T3

cohabitation with G.J. (Gary).[3]  Both parties also sought an award of attorney's fees.  None of those orders have been appealed.  We provide the following summary of the orders leading up to the plenary hearing.

In an August 7, 2015 decision, the trial court found Lisa had made a prima facie showing of a substantial change in circumstances to warrant a review of Richard's alimony obligation.  The court also found Richard had not demonstrated conclusively that Lisa was cohabiting with a person unrelated by blood or marriage.  The court ordered a forty-five day period of discovery on the issues of a modification, termination or suspension of alimony, Rebecca's unemancipation, and Lisa's cohabitation.

Richard was ordered to pay alimony in accordance with the MSA until a final ruling was entered.  The court ordered Rebecca to sign updated authorizations for the providers and treatment centers where she had received treatment from 2013 to the present.  Lisa was directed to supply the court with those records.  Lisa's motion to unemancipate Ricky was denied without prejudice.  Because it ordered discovery followed by mediation, the court denied

---

[3] Lisa alleged Rebecca should be unemancipated because she had suffered from substance abuse and mental health problems from 2011 to the present and was dependent on Lisa for financial and emotional support.

A-2594-17T3

the parties' respective requests for a plenary hearing and an award of attorney's fees without prejudice.

As a result of ongoing discovery issues, on December 11, 2015, the trial court ordered Lisa to answer the interrogatories propounded by Richard, and provide all necessary attachments and documentation that were referenced in her responses, within forty days, to the extent she had failed to do so responsively. The court denied the remaining relief sought by Richard without prejudice. The court granted a protective order as to Rebecca's mental health records and directed counsel to meet within twenty days to review the records.

Because discovery problems continued as a result of Lisa's deficient document production and failure to comply with the prior discovery order, on March 11, 2016, the trial court directed the parties to confer and respond to each other's document lists within twenty days by producing the documents or making specific objections. The court directed the parties to proceed to mediation and present any remaining discovery deficiencies to the mediator. All other relief was denied without prejudice.

On August 12, 2016, the trial ordered Lisa to cure her discovery deficiencies within fourteen days by responding point by point to the specific items of discovery still sought by Richard. The court further ordered Lisa to

5

provide a full accounting of the inheritance she received from her father's estate, including proof on where the inherited funds were deposited. The court also ordered Lisa to file an updated CIS. Lisa agreed to comply by August 30, 2016. The trial court warned Lisa that if the discovery was not supplied, her motion would be dismissed. Her application to require Richard to provide medical insurance for Ricky was denied because Ricky was not eligible for coverage under Richard's insurance plan, thereby relieving him of that obligation under the MSA. Richard was ordered to pay alimony of $800.00 bi-weekly, effective July 28, 2016, due to his unemployment. Richard's request for attorney's fees was denied without prejudice.

On August 30, 2016, the trial court issued a supplemental order dismissing Lisa's original motion to increase alimony without prejudice due to her continuing failure to provide discovery, and ordering a plenary hearing on termination or reduction of alimony.

On January 20, 2017, the trial court dismissed Lisa's original motion to increase alimony with prejudice because she failed to provide requested discovery pertaining to her father's estate, failed to provide an updated CIS with all required attachments, and failed to diligently pursue or move to reinstate her motion to increase alimony. Lisa's request to unemancipate Ricky and Rebecca

was also denied with prejudice. Lisa's requests to suppress the information and documentation pertaining to Gary during the plenary hearing was denied without prejudice. Richard's application to terminate alimony effective June 24, 2015 and to order Lisa to refund any alimony paid after that date was reserved for the plenary hearing. Lisa was ordered to provide the court with an updated CIS including all required attachments within thirty days. The court reserved the issue of attorney's fees pending the outcome of the plenary hearing.

Following a four-day plenary hearing, Judge Guy P. Ryan issued a December 29, 2017 order and seventy-three page opinion terminating alimony effective June 24, 2015, the date Richard filed his original motion, with Richard to receive a credit for all alimony he paid subsequent to that date. The court awarded Richard attorney's fees in the amount of $8800. All other requests for relief were dismissed.

In his opinion, Judge Ryan provided a comprehensive review of the testimony and exhibits regarding cohabitation, and made the following findings of fact. Lisa purchased her residence (Lisa's residence) in Burlington County before the FJOD with monies she received from equitable distribution. Plaintiff's daughter from a prior marriage, Danielle, is a co-owner of the property.

A-2594-17T3

Lisa testified Gary was "her best friend now." She started dating Gary at some time after "he was kicked out of his home" by his now ex-wife. Lisa estimated she dated Gary for about a year starting in September 2011. However, she also testified that the dating relationship ended by Christmas 2011. Lisa testified Gary only resided at her home for about a "week and a half" after he left his wife in or around April 15, 2011.

When questioned about whether she was dating Gary in February 2013, Lisa would not provide a direct answer. She admitted Gary had spent nights at her home since September 2012, but denied Gary was supporting her.

Richard hired licensed private investigator Craig Scheingold to conduct surveillance of Lisa's residence when he became suspicious of cohabitation. Scheingold surveilled Lisa's residence from March 1, 2015 through June 1, 2015. His report was admitted into evidence by consent. Scheingold testified he repeatedly observed a Chevrolet SUV with Maryland license plates and a Volkswagen sedan belonging to Gary at Lisa's residence. The registration for the Chevrolet SUV lists the address of the hunting cabin Gary owns in Maryland. Scheingold testified he observed the vehicles at Lisa's residence during early mornings and late at night. Photographs depicted the Chevrolet SUV in different locations on the property indicating it was not simply being stored there. The

8

trial court found this evidence to be "consistent with an individual staying at the home, not merely visiting."  The court concluded Scheingold's testimony established Gary resided at Lisa's residence from mid-March 2015 through June 2015.

Gary was a party in his own divorce case during the pendency of the plenary hearing.  Pleadings prepared by Gary's own attorney and other court records listed his address as Lisa's residence.  The trial court rejected Gary's testimony that Lisa's address was erroneously used in court records because his ex-wife gave the court that address, finding this explanation lacked any credibility.

Two police reports involving Gary from October 2011 and December 2011 recorded Gary's address as Lisa's residence.  In addition, a foreclosure complaint filed against Gary was served on December 4, 2013, by serving Lisa at Lisa's address.  Lisa signed the return of service, writing on the form she was his "girlfriend."  When questioned about the foreclosure complaint, Gary became angry, confrontational, and non-responsive.

Gary conceded he maintained a post office box in Columbus from April 2011 to October 2015.  The trial court found his decision to maintain a post

office box in Columbus for more than four years to be "significant evidence [Gary] was actually residing in Columbus during that period of time."

Despite repeated requests, Gary flatly refused to produce copies of his driver's license, passport, or other identification documents to verify his address. The trial court concluded Gary and Lisa withheld official documents that would verify Gary's address and drew an adverse inference against them, concluding their refusal to provide the documents "speaks volumes as to their credibility."

The trial court also found several Facebook posts by Lisa provided a "clear implication" Gary was residing with Lisa in October 2013. Other Facebook posts between Lisa and Gary confirmed their romantic relationship and his love for her children. The trial court found the "depth of emotion in the posts" to be "clearly inconsistent" with Lisa's claims that she and Gary were "just good friends" and that their dating relationship ended in 2011.

Verizon Wireless statements sent to Lisa's residence listed three cell phones and three tablets and both Lisa and Gary as users. Two of the tablets listed on the statements had Gary's name as the user or owner. During questioning regarding the bills, the trial court found Lisa "repeatedly changed her answers during the questioning about this bill. She was evasive and inconsistent, literally squirming on the witness stand and unable to make eye

contact with [Richard's] attorney." The trial court concluded "the circumstantial evidence demonstrates Lisa was sharing these devices with [Gary]."

Lisa and Gary claimed Gary moved to the home of a friend, Robert Reeves, after the two week period in or around April 2011 that they both admitted Gary lived with Lisa. Reeves testimony was riddled with inconsistencies and exhibited lack of personal knowledge. By way of example, on direct, Reeves claimed he had never known Gary to reside at Lisa's house during the last five years, or to date her in the last three years. However, on cross-examination, he admitted he had "no knowledge" as to their dating relationship. The trial court determined Reeves was a "friend of both [Lisa] and [Gary] who became caught in the middle of this adversarial matter [and] signed a certification [that] was not consistent with his actual knowledge." Therefore, "little weight" was given to his testimony.

Lisa's daughter Danielle testified she had known Gary for approximately six years, the same period she had lived with her mother. She testified Lisa and Gary had dated for about seven months in 2012, and had not dated but remained friends thereafter. She described Gary as the "grandfather" of her children. She claimed Gary did not contribute to the finances and expenses of Lisa's residence on a regular basis, but had "lent money" to her mother. Although Danielle

A-2594-17T3

claimed Gary had not resided with her and her mother at any time in the last three years, she said he did stay over occasionally and admitted Gary had received mail at Lisa's residence but no longer does so.

After reviewing the extensive testimony and financial records admitted into evidence during the lengthy hearing, the trial court concluded the evidence unquestionably demonstrated Lisa was subsidizing Gary's expenses. With regard to loans Lisa made to Gary and purchases she made for him, the judge stated:

> Moreover, these supposed "loans" were never previously disclosed by [Lisa] in discovery despite specific requests for the same. [Lisa] previously certified in interrogatory answers that she had made no loans. Only after [Richard] obtained voluminous bank records did [Lisa] claim transfers to [Gary] were "loans." Likewise, credit card statements show the purchase of a "camper" or "trailer" for $2000. [Lisa] testified this purchase was for her aunt, but this purchase was at a time [Lisa] claims she was supposedly out of money and had to borrow from [Gary]. When confronted with these obvious inconsistencies, [Lisa] would repeatedly break down and cry. In doing so, she delayed answering questions or feigned uncertainty. Early in her testimony, the court gave her the benefit of the doubt regarding her emotional upset since family court matters are often emotional. However, as her testimony continued, it became obvious [Lisa] became upset only when confronted with inconsistencies or unfavorable documentary evidence. This behavior further undermined her credibility.

The court rejects the testimony of [Gary] and [Lisa] regarding supposed loans by [Gary] to [Lisa]. Instead, the evidence is clear [Lisa] was utilizing her alimony to subsidize [Gary]. Further, any cash payments which were deposited into [Lisa's] accounts show efforts by [Gary] to conceal his income. Therefore, there is substantial credible evidence of intertwined finances as well as economic subsidies by [Lisa] to [Gary]. As [Lisa] had no other significant source of income besides her alimony, it is clear that [Richard's] payment of alimony was subsidizing [Gary] who was concealing his own monies, in whatever amounts, from his ex-wife or creditors.

While discussing the unexplained deposits into Lisa's accounts, the trial court stated:

While the exact amounts of economic contribution received by [Lisa] from other sources is somewhat confusing, it is clear [Lisa] received substantial sums. It is possible these sums were from [Gary]. It is also possible the sums were from other accounts received as a result of the death of [Lisa's] father, especially because [Lisa] never fully complied with the order to produce an accounting. Some of the accounts showed payable on death designations which passed outside the estate of her father. It is further possible these sums were from other sources. However, it is not for this court to speculate about the source of these funds. Rather, it cannot be denied that [Lisa] obtained access to these sizable amounts of cash. [Lisa] has the burden of proof in this regard to prove lack of financial entanglement. Instead, she has withheld financial records and shrouded her economic status in mystery. Accordingly, there is no other possible conclusion except that [Lisa] has not demonstrated she remains economically dependent upon [Richard].

13

The judge found Lisa "often failed to answer questions directly during her testimony," especially during cross-examination. "Her answers were frequently non-responsive" and "continually evasive when pressed for specifics." When confronted with adverse evidence, Lisa would resort to "her tired refrain of confusion coupled with a tearful reaction to questioning."

The judge further noted Lisa's answers to interrogatories failed to list her inheritance and listed only one of her Wells Fargo accounts. Her answers denying Gary was at her house late at night or early in the morning were refuted by the evidence.

The judge concluded Gary's denial of cohabitation lacked any credibility, finding his testimony to be self-serving and biased in favor of Lisa. Similarly, he found Danielle's testimony to be colored by her bias in favor of her mother and against Richard who she clearly disliked. The judge gave her testimony little weight regarding Gary's living arrangements. The judge also noted it was "illogical to think that [Gary] could be so close to [Danielle's] children, 'like a grandfather,' if he merely stayed at [Lisa's] home for a couple of weeks six years ago, before her son Lucas was even born." Indeed, Gary "testified his relationship as 'the stand-in grandfather' with Lucas" was ongoing. Guided by "[c]ommon sense and ordinary human experience" Judge Ryan determined:

such a bond with a small child would not be developed by the infrequent contact [Lisa] and [Gary] claim to have had, particularly because Lucas would not have been born when [Gary] admittedly lived with [Lisa] in 2011 . . . . It is far more likely Lucas developed this bond because [Gary] was the person who 'lived' with his grandmother, not simply because [Gary] was a "friend" of his grandmother, especially because Lucas lives in his grandmother's house, rather than visits occasionally when [Gary] is there.

Judge Ryan concluded the testimony "demonstrate[d] a close personal bond between [Lisa] and [Gary], akin to a marriage or, at least, a long-standing committed relationship, not a fleeting romance which ended in 2011."

Although Lisa and Gary do not share any bank accounts, the judge noted Gary was "hostile and abrasive" and "flatly refused to provide any response" to questions regarding intertwined finances.

Richard introduced credit card statements showing Lisa paid for a significant amount of travel by Gary, including flights to Palm Beach in 2012, and Dallas, Atlanta, Fort Lauderdale, and Charlotte in 2014. Lisa and Gary took a vacation to Lake George, New York in September 2013 that was charged to her credit card. Lisa's credit card statements also show charges in Houston while Lisa and Gary were visiting her sick uncle. When questioned about a debit card purchase in Nashville in February 2014, Lisa claimed it was her daughter but later admitted she and Gary had traveled to Nashville.

A-2594-17T3

Lisa and Gary also traveled to Nashville to attend the Country Music Awards in November 2015.  Lisa paid for the trip, including $3286 for tickets and $1615 in hotel costs.  Lisa first stated they never went on the trip because she cancelled.  She then stated the charges were for Rebecca.  Lisa then claimed she was paid back either for cancelling or by her daughter.  The trial court found there was no credible proof of any cancellation or refund.

The trial court concluded the evidence showed significant purchases for Gary on Lisa's credit cards, including travel, lodging, and meals.  Gary admitted using Lisa's credit card on his trip to Florida.   The credit card statements confirmed that he did.  Lisa testified, without factual support, that Gary "usually paid [her] back," for the travel costs.  The judge found it "unreasonable to assume [Lisa] continued to make these large purchases for [Gary] well into 2015, when their dating relationship allegedly ended in 2011."

Gary has a cabin in Maryland.  Richard introduced statements showing various expenditures in Maryland on Lisa's credit cards.  At first, Lisa testified she did not know if Gary had a credit card but later said she allowed him to use her credit card because he did not have one.  Gary used Lisa's credit card for the purchases in Maryland and a $400 ATM withdrawal in Delaware.  Lisa denied being with him when he used her card.  She first claimed Gary did not have

possession of her card but later admitted the charges show he had the card. The judge concluded Gary either had possession of Lisa's credit card and "free reign to use it," or Lisa "was physically with him, contrary to her denials."

Richard introduced evidence Lisa had purchased an all-terrain vehicle referred to as a "quad." Lisa claimed to have purchased it for Ricky, however, it was titled in Gary's name. Lisa testified she received a loan from Gary, which she likened to a car loan and claimed to have repaid, yet she denied any loans in her interrogatory answers. Judge Ryan found that explanation "illogical" since there would be no reason to "pay him back" if the quad was purchased for Gary and titled in his name.

Lisa and Gary testified they each loaned the other money. Lisa testified she loaned Gary money because he needed it to pay his property taxes and for his house. Gary admitted Lisa lent him $9000 for his house after he was injured. Lisa admitted she loaned Gary money for other things such as vehicle repairs. Despite his lack of accounts or apparent assets, Gary testified he lent money to Lisa but could not recall the specific amounts. They testified Gary had loaned Lisa money multiple times over the years, including $2500 to $3000 for college costs for one of her children. They both claimed to have paid the other back. The judge found this testimony was "simply not credible" given Gary's apparent

dire financial straits, including a foreclosure complaint. Moreover, Lisa supposedly obtained these loans from Gary who supposedly had no bank accounts, at a time when Lisa had over $650,000 on deposit in brokerage accounts. She also transferred $100,000 into her bank account to install an in-ground pool and $50,000 into her savings account, and paid off over $9000 in credit card debt at the same time she was supposedly borrowing money from Gary for the college costs of one of the children. Bank records showed she wrote a check to Gary in September 2014 for $1500 and another in October 2014 for $1600, allegedly in repayment of loans, at a time when she had at least $15,000 on deposit in her checking account and had received a large equitable distribution payout.

Judge Ryan concluded it was "illogical" that Lisa would need to borrow any money from Gary, especially such small amounts when she had so much cash on hand and large sums on deposit in brokerage accounts. The judge found it "far more likely" Lisa was subsidizing Gary's income "and attempting to disguise the same as repayment of loan amounts to him."

Richard introduced other exhibits showing numerous payments from Lisa to or on behalf of Gary, including a $3000 payment in August 2012 to the attorney representing Gary in his divorce action, and an October 2013 payment

to Gary's labor union. While Lisa claimed one of the checks was to repay a loan Gary made to her to construct her pool, she testified she withdrew $100,000 from her brokerage accounts to install the pool.

Richard also introduced subpoenaed bank records that showed significant unaccounted for deposits into Lisa's accounts. Lisa failed to provide an accounting of her inheritance from her father's estate, producing instead a cryptic letter claiming she received $80,000 in distributions between February 2013 and January 2017. Credit card statements revealed payments totaling $18,510 on Lisa's credit card accounts made from sources not traceable to Lisa's accounts, and for which she "was unable to offer any reasonable explanations." Lisa had "only a vague recollection" of her withdrawals from rolled-over retirement accounts, despite some of the withdrawals being at or near $100,000. In October 2014, Lisa received a reimbursement check of over $72,000 from her health insurer despite previously denying receiving any reimbursements. Taking into account unaccounted for deposits totaling $145,603 from Investors Bank and $93,701.67 from Wells Fargo, the judge concluded "the evidence showed over $239,000 in unaccounted for deposits during a three year period" when Lisa had no earned income.

 A-2594-17T3

The judge concluded Lisa had "received significant funds from another source or sources, other than her alimony, prior child support, or inheritance." Given Lisa's "access to these sizable amounts of cash" the judge determined Lisa had not demonstrated she remains economically dependent upon Richard.

As to sharing of household chores, the judge noted the evidence was limited because Richard did not have access to that information while Lisa and Gary "possessed all of the information regarding performance of household chores." The judge "decline[d] to blindly accept their denials of sharing chores."

Based on the testimonial and documentary evidence, the trial court concluded:

> 1. [Lisa] and [Gary] began cohabitating in April 2011, before the FJOD. Their cohabitation continued for a substantial period of time.
>
> 2. [Lisa] and [Gary] intertwined their finances, shared household chores, vacationed together, held themselves out to family members and friends as a committed couple, and created a family unit with [Lisa's] children.
>
> 3. The relationship between [Lisa] and [Gary] constitutes a long-standing, committed personal relationship tantamount to a marriage.
>
> 4. Evidence of cohabitation continues to the present day as [Lisa] has failed to establish [Gary] has a legitimate residence anywhere else besides [Lisa's residence].

20

5. [Lisa] provided substantial economic subsidies to [Gary] ranging from household expenses, legal fees, travel costs, vehicle repairs, union dues, property taxes, mortgage fees and numerous other costs, all while receiving alimony from [Richard].

6. During the same period of time as she was subsidizing the lifestyle of [Gary], [Lisa] received large sums of unaccounted for cash, the sources of which [Lisa] could not or would not explain.

7. [Lisa's] long-standing, committed relationship with [Gary] has supplanted the former marital life style which defendant's alimony payments were intended to maintain. In essence, [Lisa] has created a new life with [Gary] which has moved her beyond the need for alimony from her former husband.

The court terminated alimony retroactive to June 24, 2015, the date Richard filed his original motion. While "mindful" the MSA's cohabitation provision declares cohabitation is a change of circumstances warranting review under Lepis, the court stated Lisa had "obscured her true financial picture to the point where it is not possible to determine any economic dependency."

The trial court then engaged in the following analysis of Richard's application for an award of attorney's fees. Richard was forced to engage in "herculean efforts" to obtain financial records to establish the intertwined finances because Lisa "stonewalled" reasonable discovery requests, including filing multiple motions and serving subpoenas on third-parties to obtain the

21

discovery he was entitled to directly from Lisa. Richard's position was reasonable while Lisa's "continued evasiveness was unreasonable." The results obtained warranted some fee-shifting. Neither party has previously been awarded fees or costs. Lisa's conduct, including obstructive discovery tactics and belated production of records warranted an award of partial fees.

Richard was awarded $8800 in fees, representing thirty-two hours of trial time at $275 per hour, which the court found reasonable in Burlington County for an attorney admitted to practice in 2010. The court noted Richard's attorney "expended far greater billable hours in discovery, preparation and travel." Thus, the amount awarded "likely represents a fraction of the total fees and costs incurred."

This appeal followed. Lisa argues 1) the Family court's decision to terminate alimony based on its finding of cohabitation was error and 2) if the Family court's decision to terminate alimony is reversed, then the award of attorney's fees to defendant should be vacated as well.

Substantial credible evidence in the record supports the judge's factual findings and credibility determinations. We affirm substantially for the reasons given by Judge Guy P. Ryan in his extensive seventy-three page written opinion. We add the following comments.

22

We reject Lisa's arguments that the judge applied the wrong legal standards, misapplied the burden of proof, or erred in ruling Richard demonstrated cohabitation for a period of six months as required by the MSA to establish a change of circumstances warranting review of alimony.

"The scope of appellate review of a trial court's fact-finding function is limited." Cesare v. Cesare, 154 N.J. 394, 411 (1998). A trial court's findings "are binding on appeal when supported by adequate, substantial, credible evidence." Id. at 411–12 (citing Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 484 (1974)). "Accordingly, our review of the trial judge's discretionary termination of alimony is limited to whether the court made findings inconsistent with the evidence or unsupported by the record, or erred as a matter of law." Reese v. Wells, 430 N.J. Super. 552, 572 (App. Div. 2013) (citing Gordon v. Rozenwald, 380 N.J. Super. 55, 76 (App. Div. 2005)). As such, we will not disturb an alimony award unless we find the "determination could not reasonably have been reached on sufficient credible evidence present in the record after considering all of the proofs as a whole." Gonzalez–Posse v. Ricciardulli, 410 N.J. Super. 340, 354 (App. Div. 2009) (citing Rolnick v. Rolnick, 262 N.J. Super. 343, 360 (App. Div. 1993)).

Agreements to terminate or modify alimony "upon the cohabitation of the recipient spouse are enforceable so long as the relationship constitutes cohabitation and 'the cohabitation provision of the [MSA] was voluntary, knowing and consensual.'" Quinn v. Quinn, 225 N.J. 34, 50 (2016) (quoting Konzelman v. Konzelman, 158 N.J. 185, 203 (1999)).

A finding of cohabitation requires more than the involvement of the dependent spouse in an intimate relationship. Konzelman, 158 N.J. at 202. It also "requires more than a common residence, although that is an important factor." Ibid. Instead, cohabitation "is based on those factors that make the relationship close and enduring." Ibid. "Cohabitation involves an intimate relationship in which the couple has undertaken duties and privileges that are commonly associated with marriage[,]" such as "living together, intertwined finances such as joint bank accounts, sharing living expenses and household chores, and recognition of the relationship in the couple's social and family circle." Ibid. Stated another way, a couple is cohabitating when their "relationship 'bears the generic character of a family unit as a relatively permanent household[.]'" Reese, 430 N.J. Super. at 570 (quoting Gayet v. Gayet, 92 N.J. 149, 155 (1983)).

The supporting spouse bears the burden of proving "cohabitation to the satisfaction of the court." Konzelman, 158 N.J. at 202. However, once the supporting spouse makes such a showing, "a rebuttable presumption of changed circumstances [arises, which] shift[s] the burden to the dependent spouse to show that there is no actual economic benefit to the spouse or the cohabitant." Ozolins v. Ozolins, 308 N.J. Super. 243, 245 (App. Div. 1998). "Consequently, when faced with the circumstance of cohabitation of a dependent spouse, the court must focus on the economic relationship of the cohabitants to discern whether one cohabitant 'subsidizes the other[.]'" Reese, 430 N.J. Super. at 571 (alteration in original) (quoting Boardman v. Boardman, 314 N.J. Super. 340, 347 (App. Div. 1998)).

"[T]o rebut the presumption that the living arrangement is tantamount to marriage and has reduced or ended the need for alimony, a dependent spouse must prove he or she remains dependent on the former spouse's support." Ibid. (citing Gayet, 92 N.J. at 154-55). "Modification of alimony is warranted when either the cohabitant contributes to the dependent spouse's support or lives with the dependent spouse without contributing." Ibid. (citing Garlinger v. Garlinger, 137 N.J. Super. 56, 64 (App. Div. 1975)). "When a dependent spouse economically benefits from cohabitation, his or her support payments may be

25                                                                    A-2594-17T3

reduced or terminated." Ibid. (citing Gayet, 92 N.J. at 155). When the dependent spouse's alimony payments are being used to subsidize the cohabitant's lifestyle, the dependent spouse's support payments may also be reduced or terminated. Quinn, 225 N.J. at 49.

Governed by these principles, we are satisfied there is sufficient credible evidence to support the trial court's determination that termination of alimony was warranted based on Lisa's cohabitation with Gary for well more than six months and their economic relationship. The judge properly concluded the burden-shifting presumption applied, shifting the burden to show the lack of an economic benefit from cohabitation to the dependent spouse, because Richard "has no contact with his adult children and therefore has no access to firsthand information as to the living arrangements in his ex-wife's home." The record demonstrates Lisa "obscured her true financial picture to the point where it [was] not possible to determine any economic dependency." The judge also properly concluded Lisa "completely failed to satisfy her burden to show either a lack of financial entanglement or that she remains economically dependent."

Judge Ryan engaged in extensive fact finding and credibility determinations. His factual findings and legal conclusions are supported by adequate, substantial, credible evidence. Lisa's testimony, and that of her

witnesses, was riddled with internal inconsistencies, contradictions, statements refuted by documentary evidence, and bias. It was neither credible nor reliable. We find no basis to disturb Judge Ryan's findings or conclusions.

We review a decision to retroactively modify alimony for abuse of discretion. Reese, 430 N.J. Super. at 584. Applying this standard, we find no abuse here by the Family Court judge. A modification of alimony may be made retroactive to the date of cohabitation. Calcaterra v. Calcaterra, 206 N.J. Super. 398, 404 (App. Div. 1986). Here, the court terminated alimony as of the date Richard filed his original motion, rather than the date cohabitation began.

We next address Lisa's challenge to the attorney's fees awarded to Richard. Lisa's argument, in full, as to the fee award, states:

> If the Court reverses the order terminating defendant's alimony obligation, then the family court's award of attorneys' fees to defendant for bringing the motion to terminate alimony should also be vacated as an abuse of the family court's discretion, as the main reason for granting the attorneys' fees to defendant – that the motion had merit and was successful – would now be absent.

In light of our decision to affirm the termination of alimony, and the well settled principle that any "issue not briefed on appeal is deemed waived," we decline to address the issue of attorney's fees further "on this record as it is void of any information" necessary to attempt a meaningful review of the fee award.

A-2594-17T3

See Woodlands Cmty. Ass'n v. Mitchell, 450 N.J. Super. 310, 318-19 (App. Div. 2017) ("An issue not briefed on appeal is deemed waived." (quoting Sklodowsky v. Lushis, 417 N.J. Super. 648, 657 (App. Div. 2011))). See also Cmty Hosp. v. Blume Goldfaden, 381 N.J. Super. 119, 127 (App. Div. 2005) ("Nor are we obliged to attempt review of an issue when the relevant portions of the record are not included." (citing Soc'y. Hill Condo. Ass'n v. Soc'y. Hill Assocs., 347 N.J. Super. 163, 177-78 (App. Div. 2002))); R. 2:6-1(a)(1)(C).

We conclude Lisa's remaining arguments lack sufficient merit to warrant any further discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2594-17T3