**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4854-18T1

ROBERT J. CAMPTON, JR.,

    Plaintiff-Respondent,

v.

FRANCES CAMPTON, n/k/a
FRANCES J. ANTONUCCI,

    Defendant-Appellant.

_____

Argued November 4, 2020 – Decided November 23, 2020

Before Judges Yannotti and Mawla.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FM-12-1647-11.

Timothy J. Dey argued the cause for appellant.

Jessica L. Arndt argued the cause for respondent (Arndt & Sutak, LLC, attorneys; Jessica L. Arndt, on the brief).

PER CURIAM

Defendant Frances Antonucci appeals from a June 27, 2019 order terminating plaintiff Robert Campton, Jr.'s permanent alimony obligation on the basis of a cohabitation following a five-day hearing. We affirm.

The parties were married for slightly less than twenty-one years at the time they divorced and entered into a Marital Settlement Agreement (MSA) on October 5, 2011. Pursuant to the MSA, plaintiff agreed to pay defendant permanent alimony of $2083.33 per month. The MSA stated: "[Plaintiff's] obligation to pay alimony will terminate . . . upon the earliest of the following events: . . . c. [Defendant's] cohabitation with an unrelated adult in a relationship tantamount to marriage consistent with the decision of Konzelman v. Konzelman, 158 N.J. 185 (1999)." Paragraph sixty of the MSA stated each party was

> represented by independent counsel with respect to the drafting and execution of this [a]greement, and that full and adequate time has been available to both parties to study the precise context of this [a]greement in its final form prior to execution. . . . The parties mutually acknowledge that the provisions of this [a]greement are deemed by them to be fair, adequate, and satisfactory to each of them in all respects, and that it is being entered into voluntarily with full knowledge of its contents, and that it is not the result of any duress or undue influence.

2

Paragraph sixty-one of the MSA further stated: "[Plaintiff] and [defendant] each acknowledge they are entering into this [a]greement voluntarily, without threat, force, coercion or duress being placed upon their informed consent and voluntary act by any person."

On June 27, 2017, plaintiff filed a post-judgment motion to terminate alimony alleging defendant cohabited with C.M.[1]  He certified defendant had been in a romantic relationship with C.M. since 2013 because he noticed vehicles, which he later learned belonged to C.M., parked in defendant's driveway[2] during pick up and drop off of the children for parenting time.  He certified a search of defendant's Facebook revealed a post confirming her relationship with C.M. began in July 2013.  He explained he hired a private investigator who observed C.M. and his cars at the residence, and uncovered Facebook posts showing defendant and C.M. operated as a couple and were involved in the other's extended families' activities.  Plaintiff noted the private investigator did not turn up a physical address for C.M., implying he resided with defendant, and instead discovered C.M. had a post office box in Parlin.

---

[1]  We use initials to maintain the individual's privacy; he is not a party in this case.

[2]  Defendant resides in the former marital residence in Parlin.

A-4854-18T1

Defendant's certification in opposition dated August 2017 stated she was dating C.M. "[f]or the last three years" and they "do spend a great deal of time together[.]" Her certification promised a certification from C.M. would be forthcoming stating he resided with his sister. The record lacks such a certification.

The trial judge denied the request to terminate alimony without prejudice, ordered the parties to exchange discovery, and scheduled a plenary hearing. Plaintiff's counsel served interrogatories and a notice to produce on defendant's counsel seeking discovery relating to the cohabitation. In her February 2018 answers to interrogatories, defendant certified C.M. resided with his sister in Matawan and stated "[m]ost of our 2014 overnights were at his place[.]" She also stated "in the winter of 2017 [C.M.] repaired my bathroom . . . . The work involved tiling, repairing the vanity, and he purchased wood and material to do so. (It's his profession.)" She also certified C.M. had no key to her residence, they had no "joint/common property" and "each pa[id their] own expenses for travel, entertainment, going out, normal boyfriend-girlfriend exchanges; . . . [C.M.] pa[id] his own way and 'contributes' in a way that covers any expense he may be responsible for[.]"

4

Plaintiff filed a second motion to terminate alimony and to compel discovery. On February 2, 2019, the judge entered an order again denying the termination of alimony pending the hearing, but granted the request to compel discovery, specifically financial discovery, ordering defendant to provide the missing discovery responses within twenty days of the order and granting plaintiff counsel fees.

The trial began in September 2019. Plaintiff testified at the hearing and adduced testimony from Bari L. Kroll, a licensed private investigator and owner of B. Lauren Investigations, and her employees Christopher Vanglahn and Alfredo Diaz. Defendant called plaintiff as an adverse witness and testified on her own behalf.

Plaintiff testified "he specifically bargained for the [MSA] provision terminating alimony under Konzelman given [d]efendant's relationship with her then paramour." He testified both parties were represented by counsel when they entered into the MSA and both acknowledged it was "fair, adequate, and satisfactory to each of them in all respects," and voluntarily entered into with full knowledge, and absent duress or undue influence.

Plaintiff testified he discovered through Facebook that defendant and C.M. were romantically involved because defendant posted she was in a

A-4854-18T1

committed relationship since July 2013 and there were posts wishing defendant and C.M. a happy anniversary. He saw vehicles he believed belonged to C.M. in the driveway and, on another occasion, he observed C.M. cutting defendant's lawn and asserted C.M.'s tools and woodworking equipment were stored in defendant's garage. Plaintiff testified this caused him to hire Kroll.

Regarding discovery, plaintiff testified it was "[v]ery deficient. Lots of missing items, lots of illegible documents . . . . Bank statements could not be read." He recounted how he filed a motion to enforce discovery and attempted to resolve the discovery dispute by having his attorney forward defendant's counsel a consent order, however, defendant's attorney responded with "a picture of [the consent order] ripped up with a note saying have your PI try to find [defendant's] signature on this document."

Testifying to the answers to discovery defendant did provide, plaintiff noted that in response to an interrogatory asking about overnights, defendant stated: "Since 2014, most of our overnights have been at my place, . . . at least four nights weekly is safe." Plaintiff also noted defendant certified she did not own a vehicle and uses one of C.M.'s cars. Referring to bank statements provided by defendant in discovery, plaintiff estimated there were approximately $20,000 in deposits that were neither alimony nor defendant's

A-4854-18T1

earnings, which he attributed to financial support from C.M. However, plaintiff testified he could not determine the source of the deposits because defendant provided no deposit slips, despite plaintiff's request for copies of checks and deposit slips in discovery.

Kroll testified she has been a licensed private investigator in New Jersey for fifteen years and owned her business for ten years. She described the investigation involved observation of defendant's residence, social media, and public database searches. Pursuant to her investigation, Kroll discovered C.M. does not own a home or have a registered address in New Jersey, and instead maintained a post office box in Parlin since 2015. Kroll performed a motor vehicle search and confirmed three vehicles, namely, a Porsche SUV, a Ford pickup truck, and a Cadillac sedan, were registered to C.M. The same vehicles were observed at defendant's home.

Kroll's observation of defendant's residence revealed defendant left her residence, leaving C.M. inside on more than one occasion. On multiple occasions, C.M.'s vehicles were seen outside defendant's home overnight. Kroll observed C.M. come to the home early in the morning and "[a]s he walked in, . . . he appeared to be looking down at keys and walked right into the residence" without knocking or waiting. Kroll observed C.M. leave the residence, travel to

7

Home Depot, and return with lumber "and what appeared to be a gallon of paint" and "carrying a spackle bucket." She also observed him chatting with defendant's neighbors.

Kroll discovered several Facebook posts with pictures of defendant and C.M. She recited the captions from several of the posts, which included: "Love this guy"; "Happy Birthday to the love of my life. I'm thankful to have you in my life and appreciate all you do. You are my best friend and soul mate"; and "Love of my life." One notable caption stated: "Happy Anniversary [C.M.] I'm thankful to have you in my life and cherish each day. Looking forward to many more. Love you lots."

The Facebook posts also revealed defendant and C.M. expressing birthday wishes to C.M.'s relative, namely, a child who was celebrating her third birthday, signed "[u]ncle [C.M.] and Te-Te[3] Fran love you." Defendant also congratulated C.M.'s daughter on her birthday posting the following: "Happy Birthday to the most sweetest, generous, kind, beautiful, special girl in my life. So happy to share special moments with you. Thank you for being so caring,

---

[3] "Te-te", a derivation of "titi", is a common colloquial phrase in Spanish meaning "auntie." SPANISH DICT, spanishdict.com/translate/titi (last visited Oct. 22, 2020).

loving, and kind. Love you lots." Another post expressed affection for a different member of C.M.'s family stating: "Love this beauty."

The Facebook posts also showed defendant and C.M. in a photo celebrating the graduation of defendant's son. Defendant, C.M., and three young boys appeared in a photo on her Facebook account with the following caption: "Had a nice time at the communion. Love these boys." Although C.M.'s Facebook account did not yield as many posts as defendant's, Kroll testified his Facebook status "indicates that he is in a relationship with [defendant]."

Vanglahn testified his surveillance also showed all three of C.M.'s vehicles at defendant's residence. He stated that he observed C.M. retrieve a newspaper and enter the home. Diaz also surveilled the property, observing the vehicles late at night and early in the morning and noted they were parked in a similar position as the night before.

On the fourth day of trial, defendant's case began with testimony from plaintiff who was re-called to the stand. Near the end of plaintiff's testimony, defendant's counsel announced he would have defendant testify to the deposits into her account. The judge called both counsel to sidebar and the following colloquy ensued:

> THE COURT: Let me ask the two of you something. I know that, to this point, we haven't been able to get any

9

photographs of any checks that may have been deposited, or no identifying information, as to the deposits. Is that correct? The[ defendant's bank statements] just show deposits.

[DEFENDANT'S COUNSEL]: We did.

Whereupon, defendant's counsel announced that having listened to the transcript from the first day of testimony he "wrote the dates and amounts [of the deposits] down" and "asked [defendant] . . . to get me whatever [she] can on these, and she got me most of them."

The judge asked if plaintiff's counsel saw the deposit documents defendant allegedly obtained, and he responded he had not. The judge ordered defendant's counsel to provide the missing documentation to plaintiff's counsel before the next trial date, which was then scheduled for October 26, 2018, nine days later. However, the trial did not resume until March 20, 2019.

Before testimony resumed on the March trial date, the judge inquired whether defendant's counsel had provided the alleged missing information. Plaintiff's counsel advised he did not receive the documents and renewed his objection to defendant producing it at trial for the first time. The judge made the following findings:

> There are three accounts that were inquired of. A Chase account ending in . . . 0625. In conjunction with the request that was made, included were documents from

A-4854-18T1

January, February, April, and June. There were a few pages missing as to the June submission, specifically [p]ages [five] and [six]. July, September, and October were provided. These are all 2017, [p]ages [five] and [six] from the October submission were missing.

There was also a demand [in the] notice to produce for a Chase account ending in . . . 2481. It asked for all statements from 2014 through 2016. Nothing was supplied. There was a demand for a Chase account ending . . . [in] 2499. All statements from 2014 through 2016 were requested. Nothing was supplied.

. . . .

[Plaintiff's counsel] forwarded a letter to [defendant's counsel] indicating the deficiencies in response to the notice to produce. That letter was dated December 12, 2017. It was submitted to the [c]ourt as well. The letter states that it was sent to [defendant's counsel] along with a consent order and that the consent order was returned to plaintiff's counsel destroyed. As I recall, it was ripped up into pieces.

Any documents that were not provided, as I've just set them forth, pursuant to the requests are barred. I'm not permitting their entry into this proceeding and I'm not permitting them to be shown to the defendant for purposes of her testimony[.]

Defendant was the final witness to testify. With the exception of a few deposits, she either speculated or could not recall the source of the majority of the deposits to her accounts. She claimed C.M. rented a post office box because his sister lost his credit card bills. She confirmed the three vehicles spotted by

plaintiff and the private investigators belonged to C.M. She explained she drove the Porsche five days per week, washed and fueled the vehicle, paid for its oil changes, the vehicle was primarily available for her use whenever she wanted, she handled it as if it was her own car, and C.M. insured the vehicle. She stated C.M. used the pickup truck for work, and the Cadillac was moved to her home because C.M.'s sister's children broke the windshield.

Defendant testified her relationship with C.M. commenced November 2013 and the relationship was exclusive. Although she testified C.M. worked on projects at her home, she claimed he kept one tool in the residence. When plaintiff's counsel showed her a Facebook photo of C.M. custom building a cooler for a customer in her garage, defendant conceded the photo also showed a worktable in the garage and a tool bench. Defendant testified C.M.'s cars have been parked at her residence overnight, which she agreed signified he occasionally also stayed at the residence. She later stated he spent four overnights per week with her at the home, which was a "safe number" and responded affirmatively when counsel asked her if she and C.M. "spend a great deal of time together."[4] She confirmed they took trips together to Florida to visit

---

[4] Defendant testified the overnights were spent in a row and the longest stretch was six overnights.

12

her family for several days and celebrated her fiftieth birthday in Aruba together for five days. She testified she gave C.M. a key to the residence and he stayed in her home alone "[w]hen he did work" and he fixed her bathroom without compensation. She confirmed C.M. retained the key after completing the work in her home.

She testified he retrieved the paper for her father, who also resided with her, has taken out the trash, and some weeks buys food or pays for meals outside the residence. She stated C.M. maintained formal and casual clothing outfits in her residence in case they "have to go out and he comes from work" as well as "everyday toiletries" for "[a] couple of years." She confirmed C.M. does not rent or own property in New Jersey. She stated she and C.M. attended christenings, birthdays, five weddings, and her son's high school graduation together.

The trial judge issued a written decision in which he credited plaintiff's testimony and found the parties agreed to the <u>Konzelman</u> provision with the advice of counsel, voluntarily, without undue influence or duress, and the agreement was "fair, adequate, and satisfactory;" and concluded plaintiff proved a cohabitation under <u>Konzelman</u>. Citing defendant's and the private investigators' testimony, the judge concluded the relationship between defendant

and C.M. was "serious[,] . . . long lasting . . . [and] exclusive" and they "exhibit interdependence similar to a marriage relationship." He found defendant's admission that C.M. slept at the home four to six nights per week probative, but found her testimony "evasive and at times contradictory to [her interrogatory answers, which]" indicated C.M. "resided in the home nearly sixty . . . percent of the time, since 2014, [but] [d]efendant testified that the answer was worded incorrectly" because she "did not realize that she had to be specific as to her overnights with . . . [C.M.] in her written responses." The judge concluded this, combined with defendant's admission that C.M. spent up to six nights per week, had a key, and remained in the home when she was not present, "indicates that . . . [C.M.] resides in the home."

The judge also found "[t]he recognition of the relationship by the community is supported by [d]efendant's testimony and by [p]laintiff's expert's testimony." He noted defendant acknowledged their relationship was long-term and exclusive, and her social media accounts were

> replete with examples of [d]efendant and . . . [C.M.] in nearly identical poses, over several years, at the types of family events specifically referenced in Konzelman. Defendant testified, and [p]laintiff's expert's testimony and report show, the parties at weddings, birthdays, Christmas, celebrating anniversaries and posting pictures of vacations together. In Facebook posts made publicly to her community of friends, neighbors, and

family, [d]efendant continually refers to . . . [C.M.] as her better half and her family.

The judge found defendant's testimony that they do not hold themselves out as husband and wife, but rather as boyfriend and girlfriend, "not supported" and that "[d]efendant and . . . [C.M.] represent themselves to be in a long term and serious relationship to the community and behave as though they are husband and wife."

Regarding the deposits to defendant's accounts, the judge found although

[d]efendant's testimony to the origin of some of the unexplained deposits was credible, . . . the sizeable gaps in the information made available as well as the conduct by [d]efendant in not providing the discovery requested, undermines the credibility of [d]efendant's overall assertion that there are no common bank accounts or shared assets.

According to the judge, the "sizeable gaps" included two years of missing statements for three bank accounts and several pages missing from a three-month period of statements for one of the accounts. The judge also found defendant offered "no explanation for this failure to address the issue of . . . several and recurring deposits" and left the matter "unaddressed."

Notwithstanding, the judge stated: "Disregarding the deposits . . . [d]efendant and . . . [C.M.] have obvious financial ties through . . . [C.M.]'s contributions to the home, the structural improvements he has made to the home,

15

in household chores and household expenses as documented and acknowledged by [d]efendant." Additionally, the judge cited defendant's primary use of C.M.'s vehicle and expenses paid for it by her and C.M. as well as their shared food expenses.

The judge terminated alimony retroactive to June 27, 2017, the filing date of plaintiff's initial application. This appeal followed.

Our review of a Family Part judge's fact-finding is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). "The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence. Deference is especially appropriate when the evidence is largely testimonial and involves questions of credibility." Id. at 411-12 (citations omitted) (internal quotations omitted). While we owe no special deference to the judge's legal conclusions, Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995), we do owe substantial deference to the Family Part's findings of fact because of that court's special expertise in family matters. Cesare, 154 N.J. at 412. Therefore, we will only reverse a trial judge's factual findings when it is necessary to "ensure that there is not a denial of justice because the family court's conclusions are clearly mistaken or wide of the mark." Parish v. Parish, 412 N.J. Super. 39, 48 (App. Div. 2010) (citations omitted).

Defendant argues the trial judge erroneously based the decision in part on her alleged failure to provide discovery even though she twice answered plaintiff's discovery requests. She notes there was no discovery issue because plaintiff filed no motions after he acknowledged service of all discovery and testified from the bank records she provided. She asserts the judge erroneously based the cohabitation finding on "real or perceived discovery shortcomings."

Defendant argues plaintiff's witnesses were "wholly incredible" because they were not qualified or offered as experts, failed to demonstrate they possessed the education or knowledge of an expert, did not demonstrate "anything akin to cohabitation," and the court should not have relied on Facebook posts as evidence.

Defendant challenges the judge's credibility finding regarding plaintiff, claiming plaintiff testified he hired Kroll for the sole purpose of terminating alimony, he was not current on alimony despite his testimony to the contrary, and testified it was "possible" he was not at the marital home at all between 2015 and 2018. Defendant argues the court improperly considered missing deposits in discrediting her testimony, despite "(a) her testifying credibly[,] (b) having the requisite documentation, (c) . . . the dollar amounts being very small, and (d) [the dates] not correspond[ing] to any relevant time period here."

We begin by framing the issue before the trial judge, namely, whether defendant cohabitated with C.M. in accordance with Konzelman. In Konzelman, the parties divorced following a twenty-seven year marriage and entered into a property settlement agreement, which "provided that Mr. Konzelman's support and maintenance obligation . . . would terminate should Mrs. Konzelman undertake cohabitation with an unrelated adult male for a period of four continuous months." Konzelman, 158 N.J. at 191.

Two years following the divorce, Mr. Konzelman filed a motion to terminate his alimony obligation, providing the trial court with a private investigator's report showing a man was present at Mrs. Konzelman's home "mostly in the evening, nighttime, and early morning" and that the man returned to her residence

> most evenings [and] left the residence most mornings to go to work[,] . . . used the garage door to gain access to the garage and parked his car there. He picked up the newspaper on a regular basis and did yardwork around the residence. He answered the door to the home. He also used Mrs. Konzelman's number as a contact number for members of his softball team.
>
> [Id. at 191-92.]

At the ensuing plenary hearing, Mr. Konzelman proved Mrs. Konzelman "had a monogamous romantic relationship [with the unrelated male], which

18                                                                      A-4854-18T1

included not only spending time together at Mrs. Konzelman's home, but also vacations . . . [and] holidays together with other members of their families." Id. at 192. He also proved Mrs. Konzelman's companion "performed many household chores, including mowing the lawn, gardening, and maintaining the above-ground pool, which he bought for Mrs. Konzelman. Although [the companion] did not have a key to the premises, he did know the code necessary to disarm the alarm system and enter the residence." Ibid.

The trial judge found a cohabitation, but held the cohabitation provision, which required a termination of alimony invalid and instead held a hearing to determine the extent of economic support provided by Mrs. Konzelman's companion and reduced alimony accordingly. Id. at 192-93. We reversed and held the cohabitation provision was enforceable as written. Id. at 193.

The issue before the Supreme Court was "whether an agreement between the parties to allow cohabitation to terminate alimony obligations can be a valid basis for discontinuing alimony, without regard to the economic consequences of that relationship." Id. at 196. The Court held "a specific consensual agreement between the parties to terminate or reduce alimony based on a predetermined change of circumstances does not require an inquiry into the financial circumstances or economic status of the dependent spouse so long as

19

the provision itself is fair." Id. at 197. The Court explained such cohabitation

agreements

> must be voluntary and consensual, based on assurances that these undertakings are fully informed, knowingly assumed, and fair and equitable. . . . Fairness requires that each party be adequately represented by independent counsel and that both parties completely understand the nature of the agreement. . . . Implicit in that standard of fairness . . . is the further requirement of judicial review and approval.
>
> [Id. at 198-99.]

The Court affirmed our decision and concluded as follows:

> A mere romantic, casual or social relationship is not sufficient to justify the enforcement of a settlement agreement provision terminating alimony. Such an agreement must be predicated on a relationship of cohabitation that can be shown to have stability, permanency and mutual interdependence. . . . The ordinary understanding of cohabitation is based on those factors that make the relationship close and enduring and requires more than a common residence, although that is an important factor. Cohabitation involves an intimate relationship in which the couple has undertaken duties and privileges that are commonly associated with marriage. These can include, but are not limited to, living together, intertwined finances such as joint bank accounts, sharing living expenses and household chores, and recognition of the relationship in the couple's social and family circle.
>
> [Id. at 202.]

The Court revisited and reaffirmed Konzelman in Quinn v. Quinn, 225 N.J. 34 (2016). The parties' agreement in Quinn, following dissolution of a twenty-three year marriage, required the husband to pay his former wife biweekly alimony of $2634 and stated "alimony shall terminate upon . . . the [w]ife's cohabitation, per case or statutory law[.]" Id. at 39-40. Following a hearing, the trial judge determined the husband had proven a cohabitation but suspended rather than terminated alimony for the period of the cohabitation.

Both parties appealed. The wife argued "she did not fully understand the consequences of the cohabitation clause in the termination provision." Id. at 44. She also argued "it would be inequitable to terminate alimony permanently based on a relatively short period of cohabitation from which she gleaned no economic benefits." Ibid.

The Quinn Court found the uncontested cohabitation findings required reversal of the temporary suspension of alimony and the termination of alimony altogether. Id. at 51-53. It noted the trial judge found the wife "was engaged in the type of serious, stable, and enduring relationship that constitutes cohabitation as contemplated by Konzelman." Id. at 51-52. The Court also noted the cohabitation lasted

> almost two and one-half years. During that time, [the wife and her companion] presented themselves to

A-4854-18T1

family, friends, and coworkers as a couple. [The companion] called [the wife's] employer when she was ill, advocated on her behalf with her employer, cared for [her] father in the days before his death and participated in his funeral. [The companion's] sons by a prior marriage referred to [the wife] as "Mama Quinn" and slept in rooms reserved for them when they visited their father in [her] home.

Furthermore, [the wife] continued to cohabit with [the companion] after [the husband] filed the motion to terminate alimony and still cohabited with him when the trial commenced. This record presents a situation no different from a remarriage that terminates by death or divorce.

[Id. at 52.]

Consistent with Konzelman, the Quinn Court noted the wife "testified that she knowingly and voluntarily agreed to the terms of the agreement governing the termination of alimony" and was represented by counsel when she negotiated and signed the agreement. Ibid.

The Court addressed the wife's arguments pertaining to the economic nature of the cohabitation and the concomitant consequences of the alimony termination, stating: "To be sure, [these] consequences are serious. Yet the record demonstrates that she knew that cohabitation would risk the loss of her primary source of income and, recognizing the consequences, she proceeded to cohabit . . ." Id. at 54. The Court also stated alimony could be terminated

without a showing of an economic interdependence between the wife and her companion because "in <u>Konzelman</u>, this Court declined to import the <u>Gayet</u>[5] economic dependence or reliance rule when the parties have agreed . . . that cohabitation is an alimony-termination event." <u>Id.</u> at 54, 55.

With this as the background, we address the arguments raised on this appeal relating to defendant's failure to provide discovery of her bank accounts. As we recounted, there is no credible dispute that defendant did not comply with discovery despite the entry of a formal order compelling it and the judge's oral instruction to provide the missing deposits and checks following the fourth day of trial. Rather than produce the documents, defendant instead attempted to adduce the evidence during her testimony using documents she had not provided to plaintiff.

Our review of the trial court's evidential rulings "'is limited to examining the decision for abuse of discretion.' . . . We will only reverse if the error 'is of such a nature as to have been clearly capable of producing an unjust result.'" <u>Ehrlich v. Sorokin</u>, 451 N.J. Super. 119, 128 (App. Div. 2017) (citations

---

[5] <u>Gayet v. Gayet</u>, 92 N.J. 149, 150, 153-54 (1983) (adopting an economic needs test and holding "the test for a modification of alimony is whether the [cohabitation] relationship has reduced the financial needs of the dependent former spouse.")

omitted). Considering defendant was on notice of the information sought and had months and multiple opportunities to provide the missing information, the judge's decision to bar the eleventh-hour evidence was not an abuse of discretion.

Regardless, the economic relationship between defendant and C.M. was not dispositive here either as a matter of fact or law. The judge's decision clearly stated he did not consider the unexplained deposits proved cohabitation. Moreover, as the Supreme Court explained in Konzelman and Quinn, where the parties agree to termination of alimony language such as the language in the MSA here, economics are not the consideration.

The evidence of the cohabitation here was adduced from the mutually corroborative testimony of several witnesses. It is true Kroll and her employees were not qualified as experts. However, we need not reach the question of whether testimony offered by a private investigator in a cohabitation case can be considered expert testimony in accordance with N.J.R.E. 702 because the testimony here was purely factual. Moreover, the record lacks any evidence the judge placed greater weight on the private investigators' testimony than the other witnesses such that it affected the outcome. For these reasons, the judge's reference to expert testimony was harmless error. R. 2:10-2.

The fact testimony provided by plaintiff, defendant, and the private investigators showed defendant and C.M. had a long, stable, mutually supportive relationship that was akin to a marriage. The preponderance of the credible evidence showed C.M. resided with defendant, performed tasks for her and her family's benefit, and shared his resources with defendant. The Facebook posts, some of which defendant testified to, never denied authoring, and did not object to admitting into evidence, showed defendant and C.M. were a part of each other's family and social circles and held themselves out as a couple and participated in life's events as a couple. The substantial credible evidence in the record readily supports the decision to terminate alimony. To the extent we have not addressed an argument raised by defendant it is because it lacks sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4854-18T1