**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0293-20

JEFFREY J. TEMPLE,

     Plaintiff-Appellant,

v.

CYNTHIA G. TEMPLE,

     Defendant-Respondent.

_____

Argued June 8, 2021 – Decided June 17, 2021

Before Judges Fisher, Gilson and Gummer.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Somerset County, Docket No. FM-18-0710-03.

James P. Yudes argued the cause for appellant (James P. Yudes, PC, attorney; James P. Yudes, of counsel and on the briefs; Kevin M. Mazza and Melissa R. Barrella, on the briefs).

Paul H. Townsend argued the cause for respondent (Townsend, Tomaio & Newmark, LLC, attorneys; Paul H. Townsend, of counsel and on the brief; Kevin W. Ku, on the brief).

PER CURIAM

The parties were married in 1986, have two now-emancipated children, separated in 2001, and divorced in 2004. A January 29, 2004 dual judgment of divorce incorporated their marital settlement agreement, which obligated plaintiff Jeffrey Temple to pay defendant Cynthia Temple $5,200 per month in permanent alimony. More than sixteen years later, in July 2020, Jeffrey moved to terminate his alimony obligation, alleging Cynthia had either remarried or was cohabiting with a man with whom she had been in a relationship for at least fourteen years. The judge denied Jeffrey's motion, and he appeals arguing, among other things, he was entitled to discovery and an evidentiary hearing. We agree and reverse.

Alimony in New Jersey is, of course, governed by N.J.S.A. 2A:34-23, which allows for the ordering of alimony during the pendency of a matrimonial action or as part of a divorce judgment. The issuance of an alimony award, however, does not always end the matter. In the seminal case of Lepis v. Lepis, 83 N.J. 139, 148 (1980), the Court recognized that an award may be modified or terminated when a moving party presents a prima facie showing of changed circumstances. The law also recognizes that alimony may be terminated or modified when the supported spouse remarries, N.J.S.A. 2A:34-25, or cohabits

with another, Gayet v. Gayet, 92 N.J. 149, 154-55 (1983); N.J.S.A. 2A:34-23(n). And alimony may be terminated or modified pursuant to a consensual agreement, see Konzelman v. Konzelman, 158 N.J. 185, 193-94 (1999); the parties' marital settlement agreement recognized Cynthia's cohabitation as a reason for terminating or modifying Jeffrey's alimony obligation. In moving for relief, Jeffrey argued that Cynthia had remarried or was cohabiting with another.

In denying the part of Jeffrey's motion in which he argued cohabitation, the judge relied extensively on Landau v. Landau, 461 N.J. Super. 107, 118-19 (App. Div. 2019). That reliance was misplaced. In Landau, we held that a movant must present a prima facie case of cohabitation before obtaining discovery, but we did not define what constitutes a prima facie case of cohabitation. Landau's usefulness as a guide for such an analysis is, therefore, limited.[1]

In denying the motion as to Jeffrey's claims that Cynthia either remarried or is cohabiting, the judge also mistakenly weighed the parties' competing sworn statements and accepted as true Cynthia's explanation of the facts demonstrated by Jeffrey's moving papers. In fact, the opposite approach should have been

_____

[1] For present purposes only, we assume Landau correctly held that a family judge cannot compel discovery when only some of the indicia of cohabitation have been presented.

taken; Jeffrey was entitled to an assumption of the truth of his allegations and the benefit of all reasonable inferences to be drawn from the evidence he had marshaled. When presented with competing certifications that create a genuine dispute about material facts, a judge is not permitted to resolve the dispute on the papers; the judge must allow for discovery and if, after discovery, the material facts remain in dispute, conduct an evidentiary hearing. See Conforti v. Guliadis, 128 N.J. 318, 328-29 (1992); Palmeri v. Palmeri, 388 N.J. Super. 562, 564 (App. Div. 2006); Winegarden v. Winegarden, 316 N.J. Super. 52, 56 n.1 (App. Div. 1998); Shaw v. Shaw, 138 N.J. Super. 436, 440 (App. Div. 1976).

All that Jeffrey was required to show was a prima facie case of cohabitation. What constitutes that showing has not been precisely defined since the 2014 enactment of N.J.S.A. 2A:34-23(n). But we reject what seems to be implied in the judge's decision that evidence favorable to movant must be presented on all six statutory considerations contained in N.J.S.A. 2A:34-23(n). To be sure, the statute requires judges to consider the items listed in the statute when determining whether cohabitation has or is occurring. But whether, at the motion stage, a prima facie case has been presented focuses more on the essential meaning of cohabitation. Indeed, despite all the give and take in the motion papers about Cynthia's living arrangements, the Legislature has

determined that cohabitation does not "necessarily" mean that the supported spouse and another "maintain a single common household." N.J.S.A. 2A:34-23(n). Instead, the Legislature defined cohabitation as "a mutually supportive, intimate personal relationship" in which the couple "has undertaken duties and privileges that are commonly associated with marriage or civil union." N.J.S.A. 2A:34-23(n).

To be clear, we are mindful the Legislature mandates a court's consideration of six factors in ultimately determining whether cohabitation is or has been occurring:

> (1) Intertwined finances such as joint bank accounts and other joint holdings or liabilities;
>
> (2) Sharing or joint responsibility for living expenses;
>
> (3) Recognition of the relationship in the couple's social and family circles;
>
> (4) Living together, the frequency of contact, the duration of the relationship, and other indicia of a mutually supportive intimate personal relationship;
>
> (5) Sharing household chores;
>
> (6) Whether the recipient of alimony has received an enforceable promise of support from another person within the meaning of [N.J.S.A. 25:1-5].

A-0293-20

But we reject the argument that evidence of <u>all</u> these circumstances must be presented for a movant to establish a prima facie case of cohabitation. The statute contains a seventh item, which allows a court's consideration of "[a]ll other relevant evidence," N.J.S.A. 2A:34-23(n)(7), thereby demonstrating the statute does not contain the alpha and omega of what ultimately persuade a court that a support spouse is cohabiting.

If – as the motion judge seems to have held – a movant like Jeffrey must provide evidence on all six specific items to establish a prima facie case, then we wonder whether any movant could ever clear that obstacle. For example, if <u>Landau</u> correctly holds that compulsory discovery is not permitted until a prima facie case is shown, how is it that the movant is to obtain and present direct evidence that a former spouse and another have "intertwined [their] finances"? People tend to treat financial information as confidential and do not normally volunteer it to others, let alone former spouses obligated to pay them alimony. Information that would be helpful in demonstrating intertwined finances is also not available from financial institutions on a stranger's request. Demonstrating that a former spouse and a paramour are "sharing" or bearing "joint responsibility" for their living expenses is also something a movant is not likely able to present without a right to compulsory discovery. Absent an opponent's

A-0293-20

voluntary turnover,[2] a movant will never be able to offer evidence about the financial aspects referred to in N.J.S.A. 2A:34-23(n). And so, if, as the judge's decision suggests, a movant must check off all six boxes to meet the burden of presenting a prima facie case, a finding of cohabitation will be as rare as a unicorn. This cannot be what the Legislature had in mind when it codified the meaning of cohabitation sufficient to permit an alteration in an alimony obligation.

The judicial task in determining whether a prima facie case has been presented is far less mechanical. It is enough that the movant present evidence from which a trier of fact could conclude the supported spouse and another are in "a mutually supportive, intimate personal relationship" in which they have "undertaken duties and privileges that are commonly associated with marriage or civil union." N.J.S.A. 2A:34-23(n). We are satisfied from our review of the record – which is de novo because the judge conducted no hearing and made no factual findings – that Jeffrey presented an abundance of evidence not only as

---

[2]   Here, Cynthia provided limited information for a short span of time that neither dispels Jeffrey's contentions about that time nor at any time not covered by the volunteered information.

A-0293-20

to whether Cynthia and William Boozan are married[3] but, if they are not, whether they are or have been cohabiting.

Jeffrey has shown, based on what was available from social media and from the way Cynthia and William Boozan presented in public, as well as information from family members, that Cynthia and William are now or have in the past resided together, that they have had a fourteen-year relationship, that they have traveled together extensively, and that there are other "indicia of a mutually supportive intimate personal relationship." See Konzelman, 158 N.J. at 203 (holding, in a case decided prior to the enactment of N.J.S.A. 2A:34-23(n), that to constitute cohabitation a relationship must be shown to be "serious and lasting"); see also Quinn, 225 N.J. at 51.

---

[3]  We should note that Jeffrey's alternate claim that Cynthia has remarried – based on William's social media posts that refer to Cynthia as his "wife" – is not subject to the cohabitation analysis that takes up the lion share of this opinion. Law and public policy favor a permanent termination of alimony when the supported spouse remarries, N.J.S.A. 2A:34-25; Quinn v. Quinn, 225 N.J. 34, 49 (2016), even if the remarriage ends or is annulled, Flaxman v. Flaxman, 57 N.J. 458, 463 (1971).  When claiming a remarriage, a movant need not show a prima facie case of cohabitation.  Remarriage alone suffices, and we are satisfied that the moving and opposing papers present a genuine material dispute about whether Cynthia remarried despite her denials.  It remains only for the judge – after an opportunity for discovery – to assess the proofs at an evidentiary hearing and determine whether Cynthia has, in fact, remarried.

A-0293-20

Turning to the factual basis on which Jeffrey moved for relief, he certified that approximately two years after the divorce, he noticed William Boozan's car regularly outside the former martial home when picking up his children for weekend visitation. Cynthia and William have acknowledged they were then in a dating relationship. Jeffrey, obviously not being privy to their financial arrangements and circumstances beyond what an outsider may see without unlawfully prying, was otherwise unaware of the nature and extent of Cynthia and William's relationship for years. But, after observing social media posts that suggested more than a dating relationship, Jeffrey decided to hire a private investigator.

This investigation produced considerable evidence of cohabitation or perhaps even a marriage. Specifically, in numerous social media posts over the span of the past seven years, William Boozan referred to Cynthia as "my wife":

- On March 12, 2012, he posted "[m]y wife and I spent a week at the Fairmont, Mayakoba at the end of February 2012" and "[m]y wife entertains clients in Manhattan each week at the most-high end restaurants, and she said nothing compares to the Mayakoba experience." That same day, he also posted about a restaurant in Mexico, stating "[i]t made the evening for my wife, so I can't complain."

9

- On March 16, 2015, William posted on social media that "[m]y wife and I spent a week at Paradisus."

- In February 2016 he reviewed a Spring Lake restaurant, stating: "[m]y wife and I had dinner here on Valentine's weekend." He later added: "[m]y wife and I have been here several times."

- On February 16, 2016, William posted about "the second trip to Paradisus for my wife and I in January."

- In August 2016, he reviewed a Point Pleasant restaurant, stating "[m]y wife and I have been going here all summer, and it is what we want for every weekend."

- In November 2016, William said in a social media post that "[m]y wife and I went here [a New York restaurant] for my birthday."

- In April 2017, William and Cynthia traveled to Ireland, and he posted: "[m]y wife and I had such a great time here."

- On March 5, 2018, William posted that "[m]y wife and I had a superb experience" during a vacation in Florida.

Those posts not only reveal that William Boozan referred to Cynthia as his "wife," but they also reveal, as do the following social-media posts, that he and Cynthia traveled and participated in events extensively:

A-0293-20

- In May 2012 Cynthia and William Boozan attended the Kitchen Spring Gala together.

- In the summer of 2012, William reported in a publication put out by The Pingry School that he and Cynthia attended a reception in New York City.

- In January 2013, Cynthia and William attended an art exhibition in New York.

- In November 2013, they attended a cancer research event at the Park Avenue Armory in New York City.

- In September 2014 they attended William's class reunion.

- In May 2015 they attended another Kitchen Spring Gala.

- In March 2018, they attended a political event held by Cynthia's alma mater.

- In January 2019, they attended a Broadway show.

Other social-media posts revealed how often Cynthia and William were together for holidays and family functions:

- On Father's Day, 2016, Cynthia posted a picture of her celebrating the holiday with William Boozan.

- In November 2017, Cynthia posted a picture of herself, her son, and William celebrating William's birthday.

11

- On Father's Day, 2019, she posted a photo of herself and William celebrating the holiday and referring to him as a "very special gentleman."

Jeffrey also demonstrated that Cynthia spent a considerable amount of time with William at his Spring Lake home, which he purchased in 2016, as suggested by photos of Spring Lake she posted on her Instagram account in the Summer of 2016, November 2016, January 2017, September 2018, November 2018, April 2019, and February 2020.

Jeffrey presented other evidence that not only suggested cohabitation but also a marriage. As noted, William Boozan repeatedly referred to Cynthia in social media posts as his "wife," and Jeffrey provided in his motion papers a publication issued by a Catholic church in Spring Lake that listed Cynthia, in a Mother's Day's message, as "Cynthia Temple Boozan."

Jeffrey also presented evidence that Cynthia sold their former marital home in 2017 and purchased a New York City apartment. William Boozan acknowledged in his August 2020 certification that he gave up his New York City apartment "a few months" earlier in 2020. He presumably has, however, continued to operate his medical offices on Long Island, quite a commuting distance from Spring Lake, absent some other, closer abode. This information certainly supports an inference that Cynthia not only has resided with William

12

in his Spring Lake home,[4] but also that he has resided in Cynthia's New York City apartment.

In fact, surveillance conducted by Jeffrey's private investigator discovered Cynthia was living full-time in William's Spring Lake home between April and June 2020. Cynthia admitted this, though she claims she moved to Spring Lake only temporarily when she received a March 24, 2020 notice from her apartment manager that a resident in her building had become infected with COVID-19.[5] Jeffrey produced photos obtained by his private investigator that depict Cynthia engaging in household responsibilities, such as bringing groceries into William's Spring Lake home, performing other household shopping trips, and retrieving and opening mail. Cynthia is seen in these photographs using a key or entering the Spring Lake residence through the garage keypad access code. Even the financial records volunteered by Cynthia and William memorialize transactions by Cynthia on several occasions in early 2020, suggesting the two were together in Spring Lake on the weekends before the pandemic, and evidence of

---

[4] Jeffrey certified that their son had referred to his mother's "Spring Lake place."

[5] In her opposing certification, Cynthia claimed she called William Boozan in a "total panic" when the COVID pandemic broke out in New York City and she "literally threw some clothes in a bag, grabbed [her] laptop and work papers and went directly to Spring Lake."

A-0293-20

transactions William made in New York City near Cynthia's apartment in that same time frame.

Also telling is the fact that on June 30, 2020, Jeffrey's attorney wrote to demand that, with the filing of the motion and the pending legal dispute, they preserve "any and all records relevant and potentially relevant to all litigation in this matter." Cynthia and William responded by scrubbing their social media accounts and deleting many of the posts referred to above. This also gives rise to an inference in Jeffrey's favor.

In opposing Jeffrey's motion, Cynthia filed a certification in which she attempted to refute or explain all the information he presented. She claimed – as noted above – that she spent months "sheltering" in the Spring Lake home because of the COVID pandemic and out of concern for what she referred to, without clarity or amplification, as "race riots" in New York. She denied that she and William Boozan were or are married or that they cohabit, claiming they are only "good friends."

There may be non-cohabitation explanations for all that Jeffrey has presented, but the only question for the judge when considering the motion papers was whether Jeffrey presented enough to entitle him to discovery and an evidentiary hearing. We are satisfied he did.

 A-0293-20

We cannot emphasize enough that judges must be cognizant that most information relevant to cohabitation is not readily available to movants. These motions are akin to summary judgment motions filed prior to the completion of discovery. When, at that stage, crucial facts are within the sole knowledge of the other party, we have long recognized from the earliest days of our current court system, see, e.g., Templeton v. Bor. of Glen Rock, 11 N.J. Super. 1, 4 (App. Div. 1950), and since, see, e.g., Mohamed v. Iglesia Evangelica Oasis De Salvacion, 424 N.J. Super. 489, 499 (App. Div. 2012), the impropriety of granting summary judgment in those circumstances. Although it is true family judges should be careful not to permit a fishing expedition into a supported spouse's private affairs on a weak claim, judges must also remain aware that movants like Jeffrey do not have access to much of the information relevant to a dispute about cohabitation. In civil matters, courts often quite correctly deny or continue summary judgment motions until discovery is completed. See, e.g., Bilotti v. Accurate Forming Corp., 39 N.J. 184, 206 (1963); Mohamed, 424 N.J. Super. at 499; Templeton, 11 N.J. Super. at 4. Contrary to that well-established approach, Jeffrey was put to the burden of demonstrating the factual sufficiency of his claim when most of the relevant information remains in Cynthia's possession.

A-0293-20

In addition, the judge too severely scrutinized Jeffrey's allegations while deferring to Cynthia's explanations. The judge, for example, seems to have accepted Cynthia's assertion that: she and William Boozan are not married even though there is no dispute that William referred to Cynthia as his "wife"[6]; she resided with William Boozan only for the three-month period in which she left New York around the time the pandemic broke out[7]; and she and William Boozan are only "good friends." Jeffrey – not Cynthia – should have been given the benefit of the doubt and all favorable inferences to be drawn from the evidence so far available without discovery. Jeffrey presented a prima facie case of cohabitation – and a genuine factual dispute about whether Cynthia and

---

[6] In rejecting Jeffrey's contention that the parties would seem to be married, the judge concluded that "[s]ocial media posts are not reliable" even though William Boozan acknowledged he referred to Cynthia in these posts as his "wife," which the judge then excused by saying "[a]nyone can call someone their wife even if they are simply dating in a relationship." The judge rejected Jeffrey's claim of a marriage by stating that Cynthia "certifies she is not married to Dr. Boozan, and [Jeffrey] has failed to present any credible evidence to the contrary" because he did not present a "marriage certificate or any photograph memorializing the suspected legal union." Clearly, the judge erred by assuming Jeffrey's evidence was not true and by assuming Cynthia's general demurrer was enough to defeat Jeffrey's claim.

[7] Without hearing any testimony – let alone allowing discovery – the judge decided Cynthia resided with William Boozan between April and June 2020 "out of necessity and concern for her health and safety."

William Boozan are married – and these issues should now be developed through discovery and an evidentiary hearing.[8]

Reversed and remanded for discovery[9] and an evidentiary hearing. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[8] We note that the parties' marital settlement agreement preceded the enactment of N.J.S.A. 2A:34-23(n) but the allegations focus on Cynthia's relationship with William Boozan after the statute's enactment. To the extent there are differences between how the statute defines cohabitation and how that concept was defined by pre-statutory law, we do not opine at this time about whether Cynthia's alleged cohabitation should be considered in light of the former or the latter. See Spangenberg v. Kolakowski, 442 N.J. Super. 529, 537-39 (App. Div. 2015). Like the other relevant circumstances, the factual record has not been sufficiently developed to allow for any clear determination as to whether what the parties intended when they agreed many years ago that cohabitation would allow for the termination or modification of alimony was the standard discussed in cases like Konzelman or whether they intended that cohabitation would be determined by the law in effect when the alleged cohabitation occurs.

[9] Shortly before oral argument in this appeal, Jeffrey moved for a limited remand or to supplement the record on appeal to include "a Whitepages report" that suggests Cynthia's address is the same as William Boozan's Spring Lake address. We have denied that motion by separate order, and we have not considered this information in reaching our decision in this appeal. Notwithstanding, our ruling on the motion should not be interpreted as precluding further investigation and discovery into that particular item or any other relevant information following today's remand.

A-0293-20